## Commonwealth *v.* Merrick et al., Appellant.

*Criminal law—Riot—Inciting to riot—Picketing.*

If a sudden disturbance arises among persons meeting together for an innocent purpose, they will be guilty of a mere affray; but if they form parties and engage in violent proceedings with promise of mutual assistance, or, if impelled with a sudden disposition to demolish buildings, they are rioters, and are not excused by the propriety of their original design.

A rioter is one who inflames the peoples' minds and induces them by violent means to accomplish an illegal object.

Inciting to riot, while not a statutory offense in Pennsylvania, is an offense at common law.

In riotous and tumultuous assemblies, all persons who are present and not actually assisting in their suppression, where their presence is intentional, and where it tends to the encouragement of the rioters, are prima facie inferred to be participants, and the obligation is cast upon a person so circumstanced, and it must be his defense, to prove his actual noninterference.

The conviction of several persons on indictments for riot and inciting to riot, will be sustained, where it appears that the defendants held continuous meetings at which large numbers of workingmen were present, that certain of them made speeches advising the procuring of guns and carrying them openly; that they advised picketing and violence; that the meetings grew increasingly tumultuous and violent; that, as a result gates and doors of manufacturing plants were broken down by turbulent strikers; that the employees of such plants were intimidated by physical violence, by stopping the machinery, by the use of offensive personal epithets with threats of physical injury; that the local police who resisted were violently assaulted, and that lives were lost, many persons were injured, and much property destroyed.

*Criminal law—Jury—Challenge of jurors—Voir dire.*

The challenge of a juror for cause is addressed to the sound discretion of the trial judge, and his ruling upon the challenge will not be reversed by the appellate court unless such discretion is shown to have been abused.

Argued Nov. 16, 1916. Appeal, No. 52, April T., 1917, by defendant, from judgment of Q. S. Allegheny Co., May T., 1916, No. 401, on verdict of guilty in case of Com-

monwealth v. Fred M. Merrick et al. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Affirmed.

Indictment for riot and inciting to riot. Before PRATHER, P. J., specially presiding, COHEN, J., presiding during examination of jurors on voir dire.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty upon which judgment was passed.

*Errors assigned* were in sustaining the objection of the Commonwealth to questions asked jurors on their voir dire, various rulings on evidence, and instructions.

*William J. Brennen* and *John F. Gloeckner,* with them *Seymour Stedman,* for appellant.—To make a man party to a riot he must be active in supporting an unlawful act against the public peace: Penna. v. Craig, Addison 190 (1794); State v. Kempf, 26 Mo. 429; Regina v. Atkinson, 11 Cox Crim. Cases, 330; Sloan v. State, 8 Ind. 361; State v. Hildreath, 9 Ind. Law. 440 (1849); White v. The People, 81 Ill. 333; U. S. v. Jones, 3 Washington C. C. R. 209 (1813).

The rule is based upon natural right, and may be stated perhaps in these words: That one man's malice or misconduct shall not create another man's guilt: Regina v. Skeet, 4 Foster & Fin. N. P. 931; Rex v. Hawkins, 3 Car. & Payne 392; Regina v. Price, 8 Cox's Criminal Cases 96; Molineux v. The People, 168 N. Y. 264.

*R. H. Jackson,* District Attorney, with him *R. M. Gibson,* Assistant District Attorney, for appellee.

OPINION BY ORLADY, P. J., March 7, 1917:

The appellants, with 19 others, were indicted in the Court of Quarter Sessions of Allegheny County, on a presentment by the grand jury and district attorney's

bill, to No. 401, May Session, 1916, charged with inciting to riot, riot, etc. The trial began May 26th, and ended on June 3, 1916; the jury returned a verdict of guilty against Fred. H. Merrick, on the count charging, inciting to riot, and of guilty of riot against Merrick and fourteen others,—and not guilty, as to fourteen of the others named in the indictment. Separate appeals were taken by these defendants, but all have been presented in one argument. There are 700 pages of a printed record, with 59 assignments of error, which cover 80 pages of printed matter.

All of these defendants save Merrick, were employees of the Westinghouse Manufacturing Electric Company, and early in April, 1916, an active agitation was started among the employees of several of the manufacturing industries in and near to the Borough of Braddock, Allegheny County, in regard to the wages then paid, the number of the working hours, and the discharge of some of the employees. To further their general purpose and common undertaking, an association was formed called the American Industrial Union, with John H. Hall, president, Edgar Donaldson, financial secretary, Rudolph Blum, corresponding secretary, and a treasurer.

The testimony is voluminous, describing events occupying three weeks of time, and affecting directly or indirectly many thousands of people; the facts gathered through the examination of many witnesses, by careful review of the testimony, demonstrate beyond any question of doubt, that all these defendants were actively identified in producing, as well as continually encouraging, the conditions of which the Commonwealth complains.

Public meetings were daily held in halls, and in open air places, which were addressed by Merrick, Hall and a number of the others, and attended by crowds ranging from a few hundred to six or seven thousand in number. Parades and processions on the public highways were held under the direction of the leaders; Lithuanian and

local bands played patriotic and popular music; United States flags, plain red flags, red sashes and red banners with the letters A. I. U., (American Industrial Union), were prominently displayed; clubs and sticks were carried, and there was the tumult and shouting reasonably to be expected from large bodies of men, when seeking redress from real or imaginary grievances.

Merrick, on invitation of those interested in the strike, was brought from Pittsburgh, where he conducted a restaurant, to address the meetings and advise the strikers. At his, and others', suggestions, strike and executive committees were named, and pickets were placed at the different gate entrances to the plants. At all of these meetings, he with other defendants made addresses; the essential parts of which are not disputed, and a few citations from the testimony clearly indicate the purpose and temper of the speakers and their auditors. The addresses were made in English, Italian and other alien tongues, as many of the strikers were of foreign birth and did not understand English speech. Substantially the same arguments were presented and the same advice was given at all of the meetings, to wit: Merrick said, "I know what I am talking about, when I say that when trouble arises, I know who will be held responsible; but if trouble does come I won't be in Canada or any other place but East Pittsburgh"—"I believe in preparedness, you will win this strike"—"You men should do like the Indians used to do, if they weren't treated right they come out; the Indians would come out and face a couple of thousand trained soldiers, they didn't care. The social position of the negro to-day is due to the fact that he has been a slave, while many do not like the Indians they respect them because they have never submitted to slavery." "Don't be afraid of the police, you have a right to picket these plants, and the picket needn't be afraid of any of the guards of the company. I want 10 men to take a chance, a desperate chance, which means life or death; 50 men to go over

there and protect the scab bridge."—"You know a person can be arrested or imprisoned for carrying concealed weapons, but a person can carry a weapon openly by the Constitution of the United States."—"Now, men, there is an impression growing in the country that working men have no rights. If you are a citizen, you have the same rights as any other citizen. I tried to get a copy of the United States Constitution, but was unable to do so; but I think I can quote in substance what the Constitution says in regard to arms and the rights of citizens, and it is, that the United States government may not abridge the right of citizens to bear arms, and I advise you, at a time when everything is quiet and there is no disturbance to buy a gun like this and take it home, (at the same time exhibiting to his auditors a short barrelled gun, popularly known as a riot gun, and a revolver) get plenty of ammunition, put it with the gun, where no one else knows where it is, and keep it there. Don't get drunk, go out on the street and make a fool of yourself, shoot at every little thing you see, or see how high the gun will shoot in the air; don't get concealed weapons or carry them, for the Constitution does not give you that right."—"You must not become over-confident because there has been such a big response."—"If you men will do this, and the Westinghouse company believe you have done this, you will never have to use these guns."—"They will bring the State constabulary whether there is order or disorder, if they think it is to their advantage to do it."

While many of the above declarations were made by Merrick, they were uttered from platforms, and in open air meetings at which Hall, Donaldson, Blum and other of the defendants also spoke, and all speakers were in accord by active approval of all that each of the others stated. A large number of the strikers were unnaturalized, foreign born; not citizens, and prohibited by our Act of May 8, 1909, P. L. 446, "to own or be possessed of a rifle or shot gun."

As the strike progressed, the violent demonstrations on the highways increased, and culminated in scenes of violence, loss of life and destruction of property. Day after day the manufacturing plants were invaded by strikers who broke down the protecting gates and fence inclosures; the purpose being to induce the employees who were there at work to lay down their tools, come out and join the strikers. Such as remained were admonished, "If you don't come out, we will be back and smash you," with many like expressions.

On April 26th, Merrick was arrested and confined in the county jail until the 29th; after being released, he resumed his active participation in the strike meetings, and on May 1st, after one of the most violent disturbances, he addressed a large audience, stating, "Men, this is grand. Who ever heard of an army of men making a raid on a plant of the United States Steel Corporation? Men, this is a great victory; the idea of you men raiding these plants, going into the plants, and giving a concert in the middle of the work. It is remarkable." When he with the other leaders called for additional pickets, instructing them, to "brand them as scabs; any man that goes in brand him as a scab."—"We need not fear the militia, the police or State constabulary. Let them come on, we do not need to fear them; a body of men that has stormed a place and entered a plant the way you have done need fear none. You have already won a glorious victory. We will have a parade tomorrow morning, and we will march them to Homestead and the Carrie furnaces, and we will keep on until we visit and enter every plant in the Monongahela Valley. Bunch together and keep the men out."

Many of the assignments of error, relate to the admission of testimony of the character quoted above, which assignments on careful examination cannot be sustained, as all such testimony related to persons and incidents directly associated with acts of violence.

Merrick, Donaldson, Hall and Blum were active and

directing spirits from the time the strikers combined to secure the acceptance of their demands, and with the other defendants developed, through a course of speeches at meetings and public assemblages, a situation which resulted in open and violent defiance of law, in personal assaults, and general disturbance of the public peace.

From the earliest declaration of the common law, it has been held, that "If any person encourages or promotes, or takes part in riots, he is to be considered a rioter, for in such a case all are principals. If a sudden disturbance arises among persons meeting together for an innocent purpose, they will be guilty of a mere affray; though if they form parties, and engage in violent proceedings with promise of mutual assistance, or, if impelled with a sudden disposition to demolish buildings, there can be no doubt they are rioters, and will not be excused by the propriety of their original design: 2 Camp, 370; Hawk, B. 2, C. 65, S. 3. Where an act in itself is indifferent, if done with a particular intent, it may become criminal, the intent must be proved and found; but where the act is in itself unlawful, the proof of justification or excuse lies on the defendant, and on failure thereof the law implies a criminal intent: The King v. Phillips, 6 East's Reports 473. If persons assemble together for an unlawful purpose, every man is guilty of all acts done in execution thereof or contributing or tending to that purpose. If they meet for a lawful purpose, and proceed to an unlawful act, it is a riot: Pennsylvania v. Cribs, 1 Addison 276. As was said in Pennsylvania v. Craig, 1 Addison 190, "Government is established to restrain the passions of men by certain rules. Whether these rules be the best, that may be established or not; while they exist, they must be presumed the best, or, whether or not, they must be submitted. We are set to execute, not to make laws. Juries are not courts of honor or discretion, at liberty to do as they please, but bound by oath to judge according to truth, and the rules of the State,—that is the law."

While incitation to riot is not a statutory offense in this State, it was clearly an offense at common law, and has been always so recognized in Pennsylvania. The gist of that offense is, its tending to provoke a breach of the peace, even though the parties may have assembled in the first instance for an innocent purpose. Yet, as in this case, when they continue through a series of meetings for a number of days in perfecting their organization, and become each day more aggressive and tumultuous by public meetings on highways, with added acts of violence against persons and property, it would be refining definitions to call such meetings anything short of riots. A rioter is defined to be one, who inflames the people's minds and induces them by violent means to accomplish an illegal object; and, giving the word "incite" its plain and accepted meaning—to arouse, stir up, urge, provoke, encourage, spur on, goad,—there can be no doubt of the offense charged in the first count, without which offense, there would be but few developed riots; or assuming, for the sake of the argument, that, as contended by counsel for Merrick, riot and inciting to riot are but different modes of laying the same offense, he is not injured as he is found guilty of both offenses.

It is needless to examine whether every particular person engaged in this riot was a part of the first assembly, or actually had a previous knowledge of the design. While mere presence, without encouragement is not enough to establish criminality as to these defendants, it would be a reflection on them to say that they did not intend to be actively identified with the work they were designing and managing.

The aggressive arguments urged by Merrick, Hall and the others, certainly produced definite results, and, while they may not have intended the actual destruction of any particular building, or personal violence to any particular person, the law does not require such specific and particular proof. If the results which did follow, or ones similar to them in kind, should reasonably have

been anticipated, the law presumes that they intended the ordinary and natural results of such speeches and conduct under the conditions they produced. They certainly did not intend that such demonstrations should be meaningless, or that their addresses would not have some affirmative response from their auditors. They may not have accurately gauged the violence and tumult which resulted, but it would be idle to say, that tumult and violence of some degree was not premeditated, and was not to be reasonably expected from such incendiary addresses: Russel on Crime, 7th English Ed. book 6; Chitty's Criminal Law, Title Riots; Wharton's Criminal Law, Title Riots; 34 Cyc., Title Riots.

The gates and doors of a number of the manufacturing plants were broken down, and large numbers of these parading strikers turbulently entered these properties; intimidated the employees by physical violence and by stopping the machinery, and in the use of offensive personal epithets, with threats of physical injuries. The local police were resisted and violently assaulted.

All persons actively concerned in such combinations are equally guilty of the subsequent acts done, when they are in furtherance of the common object of the assemblage, and all who are present in the commission of any riotous act and actively engaged therein, by act, sign, or words, are to be considered as principal rioters, and, all those who incite others to commit riot, or actively participate in enterprises which reasonably lead to riot, if a riot results, may be principal rioters although absent from the place where the riot is committed: 34 Cyc. 1780. It is further held, that in riotous and tumultuous assemblies, all persons who are present and not actually assisting in their suppression may, where their presence is intentional, and where it tends to the encouragement of the rioters, shall be prima facie inferred to be participants; and the obligation is cast upon a person so circumstanced, and it must be his defense, to prove his actual noninterference: Wharton's

Criminal Law, 11th ed., vol. 3, p. 2054; 24 A. & E. Encl.
of Law 972; Lycoming Fire Ins. Co. v. Schwenk, 95 Pa.
89.

The trial was conducted by eminent counsel, who earnestly contended for every legal proposition reasonably to be urged in the interest of the defendants. Fifteen points, as presented by the defendants, were affirmed by the trial judge; nine were refused for the reason that they were stated in too broad terms to apply to the proven facts of the case.

At the conclusion of the charge, the court requested counsel to specify if any suggested proposition had been omitted or not fully answered by him, when, it was conceded that nothing further could be stated to more fairly present the cause of the defendants to the jury. The jury were properly instructed as follows: "Inciting to riot, from the very sense of the language used, means such a course of conduct, by the use of words, signs or language, or any other means by which one can be urged on to action, as would naturally lead, or urge other men to engage in or enter upon conduct which, if completed, would make a riot. If any man or set of men should combine and arrange to so agitate the community to such a pitch, that the natural, and to be expected results of such agitation, would be a riot, that, would be inciting to riot, an offense at the common law, an offense charged in the first count in this indictment. The element of riot, which is the basis of the charges in this case, is the assembling together in a riotous and tumultuous and disorderly manner, and such conduct as would tend to alarm and terrify peaceful citizens, and proceeding with a common intent and purpose to do some act in pursuance of such common intent, to do it in an unlawful manner."

When the evidence clearly shows that meetings originally peaceful and orderly are so persisted in that they degenerate into dangerous and lawless assemblages, the offense of riot is complete, and those who were originally

identified with the peaceful and orderly meetings and who persist and continue in their relation to the general undertaking until it assumes riotous proportions, the offense of inciting to riot, while a distinct and separate offense, becomes merged in the more serious crime of riot, and such participants are criminally identified with each.

The elements necessary to constitute a riot are so indisputably established in this case by the undisputed testimony, that no other verdict than guilty could have been expected.

The challenge to jurors, while presented under a special assignment, was properly disposed of in the court below. As said in Commonwealth v. Sushinskie, 242 Pa. 406, "the challenge of a juror for cause, is addressed to the trial judge, and much weight must be given to his judgment in passing upon it. In exercising his discretion as to the fitness of a juror to serve, he has the juror before him, and much latitude must be left to him. And the weight to be given to the answer of a juror when examined on his voir dire, is not to be determined exclusively by his words as we read them in the printed record. They are first to be weighed by the trial judge, who sees and hears the juror, and who in the exercise of a wide discretion, may conclude that he is competent to enter the jury box for the purpose of rendering an impartial verdict, notwithstanding his words to the contrary, and nothing short of palpable error will justify a reversal of a trial judge in passing upon a challenge for cause. The great concern of counsel as well as of courts, should always be to secure jurors free from feeling, prejudice or opinions formed as to questions at issue; for only such jurors can be safely trusted to return verdicts based upon evidence alone."

The controlling questions were of fact only so as to identify the respective persons with the admitted acts of violence and lawlessness, and all of these facts were submitted to the jury in a fair and adequate charge by the

trial judge.    The verdicts returned show that each separate case was carefully considered.

A careful examination of this whole record satisfies us that the defendants had an impartial trial.   The assignments of error in each of the appeals are severally dismissed.   The judgment is affirmed, the record is remitted to the court below and it is ordered that the defendant, Fred. H. Merrick, appear in the court below at such time as he may be there called, and be by the court committed, until he has complied with the sentence imposed, or such part of it that had not been performed at the time the appeal to No. 52, April Term, 1917, became a supersedeas.