Commonwealth of Pa. *v.* Spartaco, Appellant.

Argued December 16, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Stadtfeld, JJ.

*David Levinson,* for appellant.

*Clare Gerald Fenerty,* Assistant District Attorney, and with him *John Monaghan,* District Attorney, for appellee.

OPINION BY KELLER, J., January 29, 1932:

The appellant was indicted and convicted of inciting to riot, a common law offense. The indictment was drawn in substantial conformity with the averments approved by Mr. Chitty, and cited in 2 Bishop's Criminal Procedure, sec. 999 (4). It charged that the defendant on the 20th day of November, 1931, etc., unlawfully, wickedly and maliciously intended and devised as much as in him lay, to raise and create a riot and tumult within the County of Philadelphia to the disturbance of the peace thereof and the great terror and annoyance of the good and peaceable citizens of the said Commonwealth; and that in prosecution and furtherance of said wicked intention and purpose, and for the effecting and accomplishing thereof, he did unlawfully, wickedly and maliciously incite, encourage, promote, and as much as in him lay, endeavor and attempt and labor to persuade, instigate, induce, prevail upon, cause and procure divers and many persons whose names are unknown, inhabiting said City and County of Philadelphia, and in the neighborhood of the same being, with force and arms, etc., unlawfully,

riotously, routously and tumultously to assemble and gather together to disturb the peace of said Commonwealth and to injure and annoy, disturb and terrorize divers and many of the good citizens of said Commonwealth, contrary, etc.

The alleged occurrence took place on the recent visit of Signor Dino Grandi, the Italian Foreign Minister, to the City of Philadelphia, when a very large crowd had gathered to welcome him on his arrival at the Baltimore & Ohio Railroad Station.

At the trial which took place on November 25, five days after the alleged offense, only one witness was called by the Commonwealth to substantiate the charge, Officer West of the city mounted police. His testimony, in so far as it connected the defendant with the charge, was as follows: ''Q. Tell his Honor and the jury just what happened at the time. A. While waiting for [Signor Grandi's] car to proceed east on Sansom Street ......I happened to look towards the station and I saw the car entering Sansom, from 24th, and I saw a lot of excitement on the north side of Sansom, about 20 feet ahead of the car, and a man was hollering something in Italian, I didn't understand. Then the fists started to fly; so I rode the horse down and this man here [the defendant] was hollering ...... So I got hold of this man here and drug him from the crowd; started up the street on the side of my horse. The crowd at that time had gotten clear out into the street and blocked the path of the automobile in which the Prime Minister was riding, and the police had difficulty in getting them back on that pavement in order to let the car go by. I took him to the corner of 23d and Sansom, where we pulled for the [police] wagon.''

On cross-examination the witness stated that by ''fists flying'' he meant that fists were flying against

the defendant and that he went in to rescue him from the crowd.

On the arrival at the police station the defendant was searched and some cards and printed or typewritten matter was found in his pockets, bearing a number of slogans or catch words derogatory of Fascism and Grandi and Mussolini, and upholding Communism and Soviet Russia; but it was not shown that the defendant had distributed or made any attempt to distribute any of them, or had shown or produced them, while in the crowd, or had waved, exhibited or shown any flag, placard or other token unfriendly to Mr. Grandi or the government of Italy, or favorable to Communism and the Soviet government of Russia.

The gist of the whole matter is that the defendant was arrested, tried and convicted because he "hollered" something in Italian, which the only witness for the Commonwealth did not understand, but which was evidently resented by certain persons in the crowd. Whether they were justified in resenting or taking offense at what he "hollered" cannot be fairly determined unless the substance of what he "hollered" is known. It may be that the defendant called out something which was calculated, or might reasonably be expected, to excite the hostility of the crowd welcoming Mr. Grandi and provoke them to a breach of the peace, and if he did so, he would be guilty of the offense charged in the indictment. But on the other hand he may have called out something which was innocent of any hostile or wrongful meaning, and his words may have been misunderstood or misconstrued,—and an angry crowd is not apt to reason or consider very much, —in which event, he would not be guilty of the offense charged. The matter would depend on what he "hollered" or called out, as the car containing Mr. Grandi was approaching; and out of the thousands who were

there present and the many persons in the immediate neighborhood of the defendant at the time, the Commonwealth should have been able, if it deemed the occasion worthy of prosecution, to find some one who understood what he said and was able to give the substance of his "hollering." A jury would not be justified in inferring that his remarks were of the unlawful and malicious intent charged in the indictment merely from the circumstance that certain persons near him resented them and resorted to fisticuffs. The basis of inference, in such case, is too uncertain and too unsubstantial to justify depriving one of his liberty. It is desirable that offenses against the Commonwealth be punished surely and swiftly, but it is an absolute prerequisite to the premise, that the offense be proved, and not merely conjectured.

We are not to be understood as condoning, or minimizing in any way, the use by agitators, or enemies of society as organized in this country, of language, signs, placards or tokens calculated or reasonably likely to provoke mass action inimical to society or the public peace, and had it been proved that the defendant had called out the slogans or catchwords found in his pockets, or had shown or displayed any placard, flag or token designed to express hostility or animosity to the city's distinguished guest, or to the government which he represented, or to arouse the anger and stir up the passions of the large crowd assembled to welcome that guest, in such manner as would be likely to cause a breach of the peace, we would have no hesitation in affirming the judgment. If the defendant did any of these things he is extremely lucky that the Commonwealth failed to prove it. As was said by Judge GIBSON, when presiding at nisi prius in the case of Com. v. Haines, 4 Clark 17, where the defendant was charged with the same offense, "No man has a right to trifle with the feelings of any large class of men, so as to

provoke them to a breach of the peace." But that case supports the principle that the words uttered or the acts done must be proved to have been such as to support a finding that they were said or done, as the case may be, with intent to provoke a riot or with a reckless and wilful disregard of their probable outcome in that respect. The defendant, in that case, was charged with having hung on a tree in a neighborhood largely inhabited by Irish Catholics, a stuffed "Paddy," intended as and for an effigy of St. Patrick, accompanied with a rum bottle and a string of potatoes, evidently intended in derision of their native country and religion. It appears that in those strenuous days, a female figure known as a "Shelah," was used by certain Irish Catholics as a retaliatory emblem, and the defendant had been concerned in the exhibition of a Shelah. Judge Gibson charged the jury that if they believed the allegation of the indictment to be supported by the evidence, they should convict; but if they found that the defendant had hung up a "Shelah" but not the "Paddy," and that the characteristics and object of the "Shelah" were different from those of the "Paddy," they should acquit; and this notwithstanding that a near riot actually resulted, and the neighborhood was thrown into confusion for several weeks.

In Com. v. Redshaw, 2 Dist. 96, which was an appeal to the quarter sessions from a summary conviction for disorderly conduct, Judge Porter, afterwards President Judge of this Court, discussed the action of the defendant in calling "damned scab" and other opprobrious epithets to non-union workmen as they were passing along the public highway, and while the charge in that case was only disorderly conduct, his language is as applicable on a trial for inciting to riot. See also, in re Riots of 1844, 2 Clark 275, 279; Com. v. Craig, 1 Add. 190.

In all of these cases, however, as well as in Com. v.

Merrick, 65 Pa. Superior Ct. 482, where the fullest report in this State of such a case is given—the opinion being delivered by President Judge Orlady—the language used by the accused as forming the basis of the charge was given in full, or at least in substance, and there was no attempt to convict him merely because of the attitude shown by some of the crowd following his remarks, the substance of which no one could, or at any rate did, testify to.

This court approved in the last mentioned case the following extract from the charge of the court below, which presents in very fair and clear language the gravamen of such a charge: "Inciting to riot, from the very sense of the language used, means such a course of conduct, by the use of words, signs or language, or any other means by which one can be urged on to action, as would naturally lead, or urge other men to engage in or enter upon conduct which, if completed, would make a riot. If any man or set of men should combine and arrange to so agitate the community to such a pitch, that the natural, and to be expected results of such agitation, would be a riot, that, would be inciting to riot, an offense at the common law, an offense charged in the first count in this indictment." But as stated before it must be read in the light of the facts in that case, and in them there was definite and explicit evidence of the language used by the defendant as being likely to provoke or incite a riot. How can a jury fairly decide whether the language of the accused would "naturally lead ......to conduct which if completed, would make a riot," if no witness is able to testify to the substance of what he said?

Had there been any evidence presented that the language used by the defendant had been derogatory of Mr. Grandi, or the Fascist government of Italy, or the principles of Fascism; or had been by contrast favorable to Communism or the Soviet government of Russia, the printed material found in the defend-

8

ant's pockets, even though not publicly produced or shown by him, would have been relevant and admissible evidence as explanatory and confirmatory of his spoken words; but in the absence of evidence of the words spoken or "hollered" by the defendant it was not relevant to show what printed matter he kept hidden and unrevealed in his pockets. The matter, which in the supposititious case previously mentioned might be explained or confirmed by these printed cards or papers, would be non-existent, and hence they would not be admissible in evidence.

The defendant is not charged with any violation of the Sedition Act of May 10, 1921, P. L. 435.

We think the evidence was insufficient to sustain a conviction and that the defendant's point for binding instructions should have been affirmed.

Insufficient evidence is not ground for arrest of judgment: Com. v. Bateman, 92 Pa. Superior Ct. 53, 56; Com. v. Holstein, 76 Pa. Superior Ct. 74.

The first and ninth assignments of error are sustained. It is not necessary to pass on the remaining assignments. The judgment is reversed and it is ordered that the defendant be discharged.