Commonwealth *v.* Zwierzelewski et al., Appellants.

142

Argued September 30, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT and ERVIN, JJ. (WOODSIDE, J., absent).

*William W. Litke,* with him *Fleming & Litke,* for appellants.

*Edward L. Willard,* for appellee.

OPINION BY RHODES, P. J., January 14, 1955:

These appeals involve eight defendants, inmates of the Rockview Prison Farm, Western State Penitentiary, Centre County, Pennsylvania, who were indicted, tried, and convicted for the offense of riot in the Court of Quarter Sessions of Centre County. The crime was allegedly committed by these eight defendants, and other inmates, at Rockview between January 19 and 22, 1953. Upon motion of the Commonwealth fifteen of thirty defendants indicted were tried together. These fifteen defendants, including the eight appellants, were all convicted, and each was sentenced to a term of not less than one and one-half years nor more than three years to be computed from the expiration of sentence that each defendant was serving as an inmate of the penitentiary on January 19, 1953.

Of the eight appellants all but William Holland are represented on appeal, as they were at the trial, by the same counsel. The questions raised in each of the eight appeals are substantially identical and all the appeals will be disposed of in this opinion. These questions may be set forth as follows: (1) Can the crime of riot be committed by the inmates of a penitentiary, particularly in view of their involuntary confinement therein? (2) Assuming the inmates can be guilty of riot, was the Commonwealth's evidence sufficient to establish the participation of each individual appellant in the riot? (3) Were these appellants deprived of a fair trial because of the fact that they were tried jointly rather than separately?

Appellants concede, as they must, that the events which took place at Rockview between January 19 and 22, 1953, would make the participants therein guilty of riot in any place other than a prison. The Commonwealth by its evidence in these cases established the presence of a general disturbance, and then attempted to show the participation of each of the defendants therein. Approximately 775 prisoners were confined at Rockview in three different buildings or blocks. Block A was U-shaped and consisted of an east and west wing. There were about 175 prisoners in the east wing, and 125 in the west wing of Block A; 200 were in Block B; and about 200 were in Block C. The disturbance started about 5:45 p.m. on Monday, January, 19, 1953, and continued until the inmates of Block A finally surrendered about 7 p.m. the evening of Thursday, January 22d. Soon after 5:45 p.m. on January 19th, the inmates seized six guards, disarmed them and held them in cells as hostages. Thereafter all Blocks, A, B, and C, passed into control of the inmates. All exits and entrances were locked and barricaded. The institution was in a virtual state of siege with the in-

mates in control. Inmates roamed the cell blocks in groups, shouting and cursing, and breaking skylights and windows. Everything that could be torn loose was piled up and set on fire. The chaplain's office in Block C was completely demolished and burned. Mirrors were smashed; china toilet bowls were torn loose, and dropped from heights and broken. A barber shop in its entirety was destroyed. Inmates seized guns and went about armed. They engaged in fights among themselves and in other types of violent conduct. They broke open a storehouse in the basement, removed food therefrom, cooked and ate it. Prisoners hung hand-painted signs and banners out of windows, which referred to alleged grievances concerning parole and food. They proposed to establish their own rules and impose their own wishes. Inmates in the various blocks communicated by telephone, and by shouting and waving. They acted in concert and proceeded to execute their purpose with violence. Events took such a course that, by January 21st, 98 State Police were on the scene. Local police were alerted and local firemen called to extinguish numerous fires. Police removed women living on the grounds and blocked off roads passing near the institution. Prisoners threw various objects at firemen and policemen, and cursed them. In an effort to quell the disturbance the Attorney General of the Commonwealth, two Assistant Attorneys General, the Secretary of Welfare, the Adjutant General, and the Superintendent of State Police went to Rockview. It was indicated that the Attorney General was the only official who could exercise any influence with the inmates. The penitentiary was not fully restored to control of the officials until the evening of Thursday, January 22d. The Commonwealth established property damage of at least $73,000 by the inmates during the four-day disturbance.

Can a riot be committed by the inmates of a penitentiary? Appellants were convicted and sentenced under section 401 of The Penal Code, Act of June 24, 1939, P. L. 872, 18 PS §4401, which provides: "Whoever participates in any riot, rout, unlawful assembly or affray, is guilty of a misdemeanor and upon conviction thereof, shall be sentenced to imprisonment not exceeding three (3) years, which imprisonment may be at separate or solitary confinement at labor, or to pay a fine not exceeding one thousand dollars ($1,000), or both." The statute itself does not define the offense of riot and common law definitions must be relied upon to give meaning to the Act. *Com. v. Duitch,* 165 Pa. Superior Ct. 187, 190, 67 A. 2d 821. "A riot is commonly defined as a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent; either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner': 54 C.J. 826[828], §1: *Com. v. Kahn,* 116 Pa. Superior Ct. 28, 31, 176 A. 242, 243. Again, a riot has been defined as "the assembling together of three or more persons in a riotous, tumultuous, and disorderly manner, and proceeding with a common intent and purpose to the commission of unlawful acts which tended to alarm and terrify law-abiding citizens engaged in the peaceful exercise of their constitutional rights and privileges": *Com. v. Apriceno,* 131 Pa. Superior Ct. 158, 161, 198 A. 515, 517. See, also, *Com. v. Paul,* 145 Pa. Superior Ct. 548, 553, 21 A. 2d 421.

Appellants assert that they were involuntarily present in the penitentiary and that the Commonwealth failed to show an unlawful assembly as a necessary element of the crime of riot. Their compulsory presence in the institution prior to the disturbance in no

way rendered them incapable of, or legally immune from criminal liability for, taking active part in a disturbance which amounted in law to a riot. An assemblage lawful in its inception may become unlawful if the group conceives an unlawful purpose and proceeds to carry it out in a tumultuous and riotous manner. *Com. v. Merrick,* 65 Pa. Superior Ct. 482, 491. As stated in 46 Am. Jur., Riots and Unlawful Assembly, §10, pp. 130, 131: "Likewise, the fact that the group of persons do not voluntarily come together does not prevent their action from being that of a mob; nor is the primary purpose for which they assemble material, if they in fact form and execute an unlawful purpose after they are brought together." Assuming the inmates' presence together was originally involuntary and the result of judicial proceedings in which they were individually sentenced, there is ample evidence that between January 19 and January 22, 1953, groups of three or more, including these appellants, assembled and engaged or participated in concerted action with a common intent to execute an unlawful enterprise in a violent and turbulent manner. It is difficult to imagine concerted action which more clearly comes within the definition of common law riot. That the conduct took place in a penitentiary does not absolve appellants or change the result.

Further, although the disturbance took place within the walls and on the grounds of a penitentiary, there was abundant evidence of tumultuous disturbance of the peace by the commission of unlawful acts which tended to alarm and terrify law-abiding citizens engaged in the peaceful exercise of their constitutional rights and privileges. Guards were seized as hostages; the entire institution was taken out of the hands of the officials. Citizens of the Commonwealth were subjected to the terror and fear of a mass prison break.

Obviously such conduct disturbed the peace and terrorized the public. The fact that such action was perpetrated by a group of inmates of a penitentiary does not relieve appellants or remove them from the jurisdiction of the criminal laws of the Commonwealth. A riot may take place in a penitentiary as well as any other place. It is what occurs rather than where it occurs. A riot may take place in a church (*Com. v. Dupuy,* 4 Clark 1) or in a dwelling house (*Pennsylvania v. Bugher,* 1 Addison 333). Murder, robbery, and many other offenses may be committed in a penitentiary or prison. The fact that the Legislature, subsequent to the commission of the acts here involved, made riot in a penal or correctional institution a felony (Act of July 29, 1953, P. L. 1420, No. 401, §1, 18 PS §4401, Pocket Part) does not by any logic mean that such offense by inmates of a penal institution was not cognizable as a misdemeanor within the common law definition under the 1939 Act then in force. The action of the inmates constituted the offense of riot in the legal sense as well as in common parlance. All the essential elements of riot were established by the evidence in this case.

A review of the Commonwealth's evidence discloses definite participation in the riot by these eight appellants.

William Holland was identified as one carrying a revolver in his belt on January 19, 20, 21, and 22, 1953. So armed, Holland walked among the inmates and exercised authority over them; in doing so he was at times one of a group. On one occasion Holland ordered an inmate away from the cell where one of the guards was confined as a hostage. Another inmate corroborated the fact that Holland carried a gun in his belt during the days of the riot. Holland admitted taking food from the cellar and distributing it for consump-

tion though he claimed this was done for the benefit of the hostage guards only.

Carroll G. Kneisley took part in the destruction of property in Block C. He was identified as one of five who broke down the door to the chaplain's office, tore out the lumber and furniture and piled it in front of the building. A few minutes later the chaplain's office was fired. About four o'clock on the afternoon of January 20th, Kneisley, with another inmate, went in the sheet room over the laundry and deliberately set fire to the sheets. Later the same day Kneisley and several others destroyed everything in the cell of another inmate who had been removed from Block C. Kneisley was also observed with two companions knocking off door knobs on the E range and breaking out skylights near the chaplain's office.

Robert W. Hamm was identified as having participated with Kneisley in breaking down the door to the chaplain's office, in destroying the contents and in setting it on fire. Hamm joined Kneisley and others in knocking out skylights and breaking off door knobs.

James H. Clowe was an inmate of Block B. It was established that Clowe acted as leader of the colored inmates and a Bob Hawkes of the white. About 8 p.m. the evening of January 19th, Clowe and a group of about thirty inmates were assembled on a landing in Block B. Clowe was heard arguing with Hawkes, stating that he favored burning everything in Block B. Clowe exhorted a group of inmates, armed with razors, baseball bats and other improvised weapons, to make an assault upon the State Police, stating: "They ain't nothing but a bunch of sissies." Clowe threatened with a razor an inmate who favored surrender. He was also seen to carry a barber chair out of the shop and throw it on a pile of debris at the entrance to Block B. An

inmate named him as a leader and spokesman. He communicated with the other block by telephone. It was under his authority that some sick individuals were released. During conferences with officials relative to surrender Clowe controlled the noisy inmates by his shouted command of "silence."

An inmate saw John Zwierzelewski, with others, remove mattresses from the supply room and pile them at the main entrance to Block B where a fire occurred. Another observed Zwierzelewski break open the cupboard door of the supply room in Block B by using a bar or baseball bat. Zwierzelewski walked around Block B, January 19th to January 21st, carrying a strap with a padlock fastened on the end, and he was seen to break some of the windows in Block B.

An inmate who read a list of grievances to the assembled inmates in Block A testified appellant Kenneth W. Harris carried a shotgun which Harris used to prevent inmates from leaving the cell block at the beginning of the riot. At the inception of the disturbance Harris, standing downstairs with a group of inmates, shouted to others: "Come on down here. . . . Everybody's in on this; this is it." Later Harris informed an inmate he had been locked in his cell because the inmate "was a cop at heart" and "brought some of the boys to the penitentiary." Harris went about during the riot, armed with a wooden club, giving orders.

About seven o'clock the evening of January 20th the appellant Vernon Masterson came to the cell of one of the inmates of Block A and threatened him. Masterson acted as spokesman for the inmates in Block A. Three of the hostage guards were taken from one area to the front of the west wing of Block A where Masterson, standing on the roof of a guard enclosure, about 3 p.m. on January 21st, read a list of grievances

to the assembled inmates and the hostage guards. Masterson admitted reading a list of grievances but claimed he did it under threat of duress by other inmates. He denied having a gun. However, he was present with others who had guns.

Donald L. Ray was one of three inmates of the east wing of Block A who took by force a .38 caliber revolver from a guard when the riot started. Ray took the disarmed guard downstairs at gun point where, with other hostage guards, he was locked in a cell and held in various locations until seven o'clock, Thursday evening, January 22d. Ray was seen by other inmates, during the period of the riot, near the office carrying a revolver in his hip pocket or under his belt. Testifying in his own behalf, Ray denied taking a gun from a guard or participating in the disturbance, although he did admit that he joined the crowd and took canned food from the cellar of Block A.

Each of the eight appellants was shown to have actively participated with two or more persons in this tumultuous disturbance of the peace and destruction of public property which was in law and in fact a riot. The evidence of participation of each appellant is ample to support his conviction. In so far as each appellant denied participation, his credibility was for the jury.

Appellants claim they were deprived of a fair trial by reason of the court's granting the Commonwealth's motion for consolidation for trial of the indictments against fifteen of the thirty defendants. They argue that the voluminous evidence produced (860 typewritten pages) was not relevant and material as to each of the appellants, was therefore prejudicial, and deprived each of a fair trial.

The consolidation of indictments for trial is a matter for the trial court to determine in the exercise of

a sound discretion, and appellate courts will not reverse except for a clear abuse of such discretion. *Com. v. Mulroy,* 154 Pa. Superior Ct. 410, 412, 36 A. 2d 337; *Com. v. Kaysier,* 166 Pa. Superior Ct. 369, 373, 71 A. 2d 846; *Com. ex rel. Haines v. Burke,* 173 Pa. Superior Ct. 477, 481, 98 A. 2d 208; *Com. v. Kloiber,* 174 Pa. Superior Ct. 483, 486, 101 A. 2d 444. Only where it is shown that the defendants have been prejudiced or injured by reason of the consolidation for joint trial of separate indictments will the exercise of discretion by the trial court be reversed. *Com. v. Mulroy,* supra, 154 Pa. Superior Ct. 410, 413, 36 A. 2d 337. The action of the trial court in consolidating the fifteen indictments for trial has not been shown to be an abuse of discretion, and appellants were not prejudiced thereby or deprived of a fair trial. It was proper for the Commonwealth to prove the fact that a riot occurred, at the time and place alleged, and the participation of each and every individual defendant therein. All the events were closely related in time and place; they took place within the penitentiary grounds between January 19th and January 22d. When it was established that a riot occurred, all who actively participated therein were equally guilty as principals. The applicable law is set forth in *Com. v. Merrick,* supra, 65 Pa. Superior Ct. 482, 488, 490: " 'If any person encourages or promotes, or takes part in riots, he is to be considered a rioter, for in such a case all are principals.' . . . All persons actively concerned in such combinations are equally guilty . . . as principal rioters, . . ."

The Commonwealth's evidence was sufficient to establish concerted action and singleness of purpose among the inmates, including appellants. Evidence of acts done in furtherance of the common design was admissible against all participants. *Com. v. Merrick,* su-

pra, 65 Pa. Superior Ct. 482, 487; *Com. v. Apriceno,* supra, 131 Pa. Superior Ct. 158, 170, 198 A. 515. See, also, *Com. ex rel. Moszczynski v. Ashe,* 343 Pa. 102, 104, 21 A. 2d 920. The rules relating to evidence tending to establish concerted action and the identity of persons participating in a riot are analogous to those where there is a criminal conspiracy. 46 Am. Jur., Riot and Unlawful Assembly, §16, p. 134. It is relevantly stated in 4 Wigmore on Evidence, 3d Ed., §1079, pp. 127, 131, as follows: "A conspiracy makes each conspirator liable under the criminal law for the acts of every other conspirator done in pursuance of the conspiracy. . . . Where the alleged conspiracy was carried into effect by the acts of a mob or other riotous assembly or seditious society, the defendant whose instigation and leadership are proved becomes liable for the mob's acts, and thus the conduct and statements of any and all persons in the mob, whether identified or not, become a proper subject of consideration; and a field of somewhat indefinite extent is opened."

The trial court made it very clear to the jury that appellants were not to be found guilty because of their mere presence in the penitentiary at the scene of the disturbance, but must be found, on legal and substantial evidence, to have actively participated therein. The charge to the jury by President Judge WALKER was complete and comprehensive, and it has not been questioned on these appeals. As we have said, the Commonwealth established the offense of riot and the identity and the participation of each appellant. Even if, as argued for appellants, other charges could have been made against them for their unlawful conduct, the charge of riot was not thereby precluded. Under the facts and circumstances, indictments and convictions for riot were permissible and proper. The right of ap-

pellants to a fair and impartial trial was fully protected; the verdicts and sentences are affirmed.

Judgment of sentence is affirmed as to each appellant as follows:

| | |
|---|---|
| John Zwierzelewski | No. 42, October Term, 1954 |
| Carroll G. Kneisley | No. 43, October Term, 1954 |
| Donald L. Ray | No. 44, October Term, 1954 |
| James H. Clowe | No. 45, October Term, 1954 |
| Vernon Masterson | No. 46, October Term, 1954 |
| Kenneth W. Harris | No. 47, October Term, 1954 |
| William Holland | No. 48, October Term, 1954 |
| Robert W. Hamm | No. 49, October Term, 1954 |

WOODSIDE, J., took no part in the consideration or decision of these appeals.