523 F.2d 1099
 173 U.S.App.D.C. 150
 UNITED STATES of America
v.
James BRIDGEMAN, Appellant.
UNITED STATES of America
v.
Henry B. JOHNSON, Appellant.
UNITED STATES of America
v.
William BROWN, Appellant.
UNITED STATES of America
v.
Robert G. MATTHEWS, Appellant.
UNITED STATES of America
v.
Terry L. BURGIN, Appellant.
UNITED STATES of America
v.
Keith G. GREENFIELD, Appellant.
UNITED STATES of America
v.
James R. LANGLEY, Appellant.
UNITED STATES of America
v.
Henry B. JOHNSON, Appellant.
UNITED STATES of America
v.
Henry JOHNSON, Appellant.
UNITED STATES of America
v.
Henry B. JOHNSON, Appellant.
 Nos. 74-1475, 74-1476, 74-1497, 74-1514, 74-1615, 74-1646,
74-1874, 74-2034, 74-2055, 74-2127.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 22, 1975.
Decided Nov. 28, 1975.
 
 George P. Lamb, Jr., Washington, D. C. (appointed by this court), for appellant in No. 74-1475.
 Richard H. Chused, Washington, D. C. (appointed by this court), for appellants in Nos. 74-1475, 74-2034, 74-2055 and 74-2127.
 Fred Warren Bennett, Washington, D. C. (appointed by this court), for appellant in No. 74-1497.
 Peter D. Ehrenhaft, Washington, D. C. (appointed by this court), for appellant in No. 74-1514.
 Arthur B. Goodkind, Washington, D. C., with whom Merrill F. Hathaway, Jr., Washington, D. C. (both appointed by this court), was on the brief for appellant in No. 74-1615.
 Benjamin W. Heineman, Jr., Washington, D. C. (appointed by this court), for appellant in No. 74-1646.
 Lawrence H. Schwartz, Washington, D. C. (appointed by this court), for appellant in No. 74-1874.
 David E. Wilson, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James F. McMullin, John O'B. Clarke, Jr., Lester B. Seidel and Paul N. Murphy, Asst. U. S. Attys., were on the brief for appellee.
 Before TAMM, MacKINNON and WILKEY, Circuit Judges.
 Opinion for the court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 We review here the contentions raised by seven appellants who, among others, were charged in a joint indictment with offenses related to a conspiracy, an attempted jail break, and a riot at the District of Columbia jail. Evidence of the guilt of each appellant has been separately considered against the contentions they cumulatively raise on appeal. Finding all the arguments raised by counsel to be without substantial merit, we affirm all convictions.
 
 The October 11 Uprising
 
 2
 Following a five-month special grand jury investigation and pursuant to a voluminous indictment, appellants in these consolidated appeals were tried in three separate jury trials before Judge Gasch in February and March of 1974 for offenses stemming from the October 11, 1972 riot at the District of Columbia jail. Appellant James A. Bridgeman, testifying under a grant of immunity as a Government witness in the third trial following his conviction in the first, recounted that he, Frank Gorham and Robert N. Jones[1] conceived an escape plan in late September or early October of 1972. The three were smuggled a revolver loaded with five rounds, and they initiated the plan on October 11.
 
 
 3
 Jones feigned illness in his cell; when two officers entered to assist him, Gorham accosted them with the revolver. The two inmates secured these officers in Jones' cell and proceeded to acquire more hostages first, the third member of the night shift, then the four members of a skeletal "goon squad" alerted to the trouble in Cell Block 1. Gorham and appellant Keith Greenfield promptly assumed leadership of that contingent of prisoners who asked to be released. There followed an initial and abortive attempt at escape both by cutting bars with an acetylene torch and by climbing out a fifth-floor skylight. During this period a homosexual inmate was brutally raped over a period of six or seven hours, and several of the appellants administered damaging blows to their captives in particular, appellant Terry L. Burgin beat Lieutenant Charles Wren, leader of the "goon squad," in the head with a hammer and ground a gun barrel into the Lieutenant's temple until the officer asked to be killed rather than tortured. Also during this time D. C. Corrections Director Kenneth Hardy entered the jail with Washington Post Reporter William Claiborne, as the inmates had requested. Prisoners lectured these men about the "revolution" they were conducting and allowed no opportunity for discussion or negotiation.
 
 
 4
 With Hardy as a hostage, the inmates redirected their escape toward the jail's central Rotunda. They intermingled with and tied themselves to the prison guards, who were to serve as shields. Inmates who did not want to participate were ordered to leave the second tier landing adjacent to the Rotunda, which served as a staging area for the attempt. Appellants Bridgeman, Henry B. Johnson, Keith C. Greenfield, William Brown, Terry L. Burgin, and Robert G. Matthews all stood poised to rush the Rotunda door. They surged forward, with Hardy at the head of the phalanx, and Matthews and Burgin, both tied to the Corrections Director, struck him to heighten the sincerity of his entreaty to officials on the other side of the Rotunda door that the group be let out. After suffering a brutal beating, Hardy persuaded his captors that his commands no longer carried any force and that the door would not be opened, whereupon the prisoners retreated to their cells on the second tier to reassess their predicament.
 
 
 5
 Together with Jones, appellants Burgin and Brown determined to make a final escape attempt. After continued brutalizing of Hardy and Wren, the inmates led the latter man to a window looking out on 19th Street, S.E., beat him to make him plead for his captors' release, and cut him with jagged shards of glass in the broken window. This time Wren had to explain to the inmates that by Department of Corrections regulations hostages lost all authority, and finally he was led back to the cell where he had been imprisoned. The escape attempt had been frustrated, and by early morning, October 12, 22 hours after the riot had begun, the last hostages were released. Officials who assessed the damage done to the jail estimated more than $76,000 in property damage, primarily through arson.
 
 The Indictment
 
 6
 Appellants were collectively charged in an indictment filed October 5, 1973. The first count charged an unlawful conspiracy, beginning on or about October 1, 1972, and continuing up to and including October 11, 1972, to escape from the custody of the Attorney General in violation of 18 U.S.C. § 751; and to kidnap and assault correctional officers (jail guards and personnel) in violation of D.C. Code §§ 22-502 and 2101. In addition to 14 named defendants the indictment alleged the existence of other known and unknown conspirators. The named defendants included the following seven appellants: James A. Bridgeman, James R. Langley, William Brown (not William E. Brown, another codefendant), Terry L. Burgin, Keith G. Greenfield, Robert G. Matthews and Henry B. Johnson.
 
 
 7
 The entire indictment as returned by the grand jury contained 49 counts. In addition to the conspiracy count, counts 2 through 15 charged the seven appellants here and others with attempted escape. Counts 16 through 27 charged appellants and others with kidnapping 12 hostages with intent to hold and detain them for the purpose of effecting an escape from the District of Columbia jail. Counts 28 through 38 charged appellants and others with armed robbery of money and designated property taken from 11 named individuals in violation of D.C. Code §§ 22-2901, 3202. Count 39 charged the seven appellants and others with incitement to riot, in the course of which there was resulting property damage in excess of $5,000 and serious bodily harm to Charles Wren, Bruce A. Davis and Santionta C. Butler, in violation of D.C. Code § 22-1122(d). The indictment charged that Wren was beaten about the body and head with a pistol and other weapons, causing grave bodily harm. It was further alleged that Bruce A. Davis and Santionta C. Butler were repeatedly forced to engage in both anal and oral sodomy, also causing grave bodily harm.
 
 
 8
 In the indictment's fortieth count, Matthews was charged with anal sodomy upon a male, Santionta C. Butler. The forty-first count charged Brown with anal sodomy upon Butler. In the forty-third count, Johnson was charged with oral sodomy upon Butler. The forty-fourth count charged Matthews with assaulting Kenneth L. Hardy with a dangerous weapon, a pistol. The forty-fifth and forty-sixth counts charged Brown with a similar assault upon both Charles Wren and Kenneth Hardy, respectively. In the forty-seventh count, Burgin was charged with assaulting Charles Wren with a dangerous weapon, that is, a pistol and a hammer. And the forty-eighth count charged Burgin with the same assault upon Hardy. The forty-second and forty-ninth counts were irrelevant to this proceeding.
 
 
 9
 The trial court severed the cases of these seven accused into three separate trials, the transcripts of which total 4,363 pages. The trial of Bridgeman, Langley, Greenfield, and Matthews began on February 7, 1974. Brown and Johnson were tried from February 19 to 26, 1974. Burgin was tried in late March, 1974 in a joint trial with other defendants whose appeals were not consolidated with the cases we consider here.
 
 
 10
 The first trial resulted in the conviction of Bridgeman, Langley, Matthews, and Greenfield on counts of conspiracy, attempted escape, 12 counts of armed robbery, and inciting a riot. Matthews was also convicted of assault with a dangerous weapon. In the second trial Brown and Johnson were convicted of conspiracy, attempted escape, 12 counts of armed kidnapping, inciting a riot, and robbery as a lesser included offense of armed robbery. In the third trial Burgin was tried jointly with Gorham, Jones (Wilkerson), Ewing, and Fields (see United States v. Gorham, --- U.S.App.D.C. ---, 523 F.2d 1088 (decided Nov. 28, 1975)) and convicted of attempted escape, two counts of assault with a dangerous weapon and two counts of armed kidnapping.
 
 
 11
 On appeal, each of the seven appellants was represented by separate counsel, and each counsel made separate arguments of issues related to his particular client, though in many instances one claim involved several appellants. We have considered the cases of each individual separately and we now discuss each of these arguments separately in the name of the particular appellant in whose behalf the issue was argued.
 
 
 12
 (1) Keith G. Greenfield
 
 
 13
 Greenfield attacks the refusal of the trial court to grant a severance of the trial of Bridgeman from the trial in which Bridgeman, Greenfield, Langley, and Matthews were tried. His contention is that severance would have allowed Bridgeman to testify subsequently in Greenfield's behalf, concerning certain allegedly exculpatory facts generally, that Greenfield did not participate in the conspiracy.
 
 
 14
 The proffer made during trial with respect to Greenfield's position was the most specific. At that time, counsel stated
 
 
 15
 As realted (Sic) to Mr. Greenfield, he would testify that Mr. Greenfield did not parcipate (Sic) in the formulation or the execution of the conspiracy, and that he had no prior knowledge prior to the opening of the first cells, and did not subseqnently (Sic) subsequently become a part of the conspiracy as a coconspirator.
 
 
 16
 (Tr. 1160) A similar contention was raised by Matthews, I. e., that Bridgeman would testify that Matthews did not participate in the formulation or the execution of the conspiracy nor in the attempted jail break. (Tr. 1160) And Langley made a similar proffer that Bridgeman would testify "that when the cells were opened by Gorham and Jones that Langley went to the end of the tier and remained there, and that there was absolutely no participation or no advance knowledge of any conspiracy or any of the offenses for which he stands charged today . . . "
 
 
 17
 In further support of these contentions counsel claimed that Bridgeman, if granted severance, would testify that he was a ringleader in the conspiracy, that to his knowledge neither Greenfield, Matthews nor Langley was involved in the planning of the escape attempt, that he did not see any of the three participating in the escape and riot activities within the cell block, and that he did not see appellant Matthews hold a gun to Hardy's head. Bridgeman's willingness to give testimony exculpating Greenfield, Matthews, and Langley was conditioned on the Government's acceptance of his offer to plead guilty to the conspiracy count and be tried on the remaining counts prior to the trial of those three appellants.
 
 
 18
 The general rule is that the decision to grant a severance is within the sound discretion of the trial judge, whose judgment will not be reviewed absent a clear abuse of discretion. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). Under Rule 8(b), Fed.R.Crim.P., defendants may be tried jointly when "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." We have interpreted this Rule to create a presumption that persons jointly indicted should be tried together. Hall v. United States, 83 U.S.App.D.C. 166, 171, 168 F.2d 161, 166, Cert. denied,334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948). United States v. Echeles, 352 F.2d 892, 896 (7th Cir. 1964), is in accord, but adds the condition, to which we subscribe, that cases are to be severed if severance is necessary to insure a fair trial. United States v. Gambrill, 146 U.S.App.D.C. 72, 87, 449 F.2d 1148, 1163 (1971). Where the essential fairness of a trial is not impaired by a refusal to sever, the incremental burden of duplicating a complex trial or reproducing elusive evidence is a proper consideration in the decision to deny severance. United States v. Shuford,454 F.2d 772, 777 (4th Cir. 1971).
 
 
 19
 The unstated premise of appellants' severance claim is that testimony showing they did not participate in the planning of the October 11 uprising would exonerate them of the charge of conspiracy. Their position demonstrates a surprising lack of understanding of the law of conspiracy. The indictment in this case charges a completed conspiracy; there was proof not only of the original unlawful agreement to commit the designated offenses, but also that certain objects of the conspiracy were carried out by numerous specific overt acts extending over a considerable period of time. The secret plan of October 1 was publicly executed on October 11 and into the early hours of October 12. Appellants were charged with participation in this continuum of events, not merely collaboration at its outset.
 
 
 20
 (3-5) A defendant can join a conspiracy at any time, and can properly be convicted though he was not in the conspiracy at its inception. United States v. Cerrito, 413 F.2d 1270 (7th Cir. 1969), Cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970); Cave v. United States, 390 F.2d 58 (8th Cir.), Cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968); Nassif v. United States, 370 F.2d 147 (8th Cir. 1966); United States v. Hickey, 360 F.2d 127 (7th Cir.), Cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). There is no need that he participate in all acts of the conspiracy. United States v. Friedman, 445 F.2d 1076 (9th Cir.), Cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); United States v. Levinson, 405 F.2d 971 (6th Cir.), Cert. denied, 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1971). An individual who joins an already formed conspiracy knowing of its unlawful purpose may be held responsible for acts done in furtherance of the conspiracy both prior to and subsequent to his joinder. United States v. McGann, 431 F.2d 1104 (5th Cir. 1970), Cert. denied, 401 U.S. 919, 91 S.Ct. 904, 27 L.Ed.2d 821 (1971); United States v. Knight, 416 F.2d 1181 (9th Cir. 1969); Nelson v. United States, 415 F.2d 483 (5th Cir. 1969), Cert. denied, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970); Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), Cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (civil conspiracy). Where the evidence shows that a defendant knew of the conspiracy, associated himself with it and knowingly contributed his efforts during its life to further its design, he may be convicted of conspiracy. Langel v. United States, 451 F.2d 957 (8th Cir. 1971); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969); United States v. Levinson, supra; Cave v. United States, supra; Nassif v. United States, supra; United States v. Hickey, supra; McManaman v. United States, 327 F.2d 21 (10th Cir.), Cert. denied, 377 U.S. 945, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964).
 
 
 21
 Appellants and their attorneys spoke in conclusory terms when they contended that Bridgeman's testimony would have been "exculpatory." Bridgeman could have testified that Langley, Matthews and Greenfield did not participate in the planning of the disturbance with other early conspirators, but under the legal principles recited above, that proffer did not suggest the conclusion that those appellants were not co-conspirators in the event. Their voluntary enlistment in the escape effort and their well-documented acts in support of its purpose lead us to the view that they joined the conspiracy prior to its completion; thus testimony that they were not present at its inception would not be exculpatory.
 
 
 22
 The strength of the evidence against these three appellants bears review, not only to reinforce our conclusion that they were active participants in the conspiracy to escape, but also to demonstrate that the decision to deny severance, were it Arguendo found to be erroneous, could not conceivably be deemed prejudicial.
 
 
 23
 Matthews was identified by three hostages as the inmate who, along with Burgin, attempted to use Hardy as a human shield at the time of the Rotunda escape attempt. There was also testimony that Matthews held Hardy by the collar in the dining room at the time preparatory instructions were being given to the would-be escapees; that Matthews escorted Hardy toward the Rotunda door as the group began moving in that direction (Tr. 770, 805-806); that he held the gun to Hardy's head (Tr. 268-69, 594-95, 631, 658); and that he participated in a discussion with Hardy, Burgin, Brown, Gorham, and Jones on the second tier immediately after the unsuccessful Rotunda attempt (Tr. 295-96, 772, 820). In his defense, Matthews called two fellow inmates who denied that his hair style on the day in question suited a description given by various government witnesses, and who offered the opinion that his opportunities to have been wearing freshly laundered clothes, as government witnesses claimed, were not great (Tr. 1163-1168, 1173-1178).
 
 
 24
 Appellant Greenfield was identified as a participant in the incident even prior to the capture of the "goon squad" (Tr. 360-62), as one who took an active part in the armed capture of Officers Saunders (Tr. 495, 509), Michelow (Tr. 627), and Holmes (Tr. 703), as the prisoner who pointed the gun into the cell of Lt. Wren and Officer Cruse and threatened to kill them (Tr. 480, 744), and as a member of the group which attempted to escape through the Rotunda door (Tr. 413-14, 807-08). Greenfield called a fellow inmate who testified that he had left the jail in the early afternoon hours of October 11, well after the Rotunda escape attempt (Tr. 1010). This witness was partially impeached by inconsistent grand jury testimony regarding Greenfield's role on that day (Tr. 1181-93). Greenfield also called a Deputy United States Marshall who testified that Greenfield could not have placed his hands before his face during the line-up, as claimed by a government witness, since Greenfield's hands were handcuffed behind him (Tr. 1199-1200).
 
 
 25
 Inmates also testified that Langley was present in the cell when the gun was being examined on October 2 (Tr. 184-85); that he apparently actually opened the cells and freed the inmates on October 11 (Tr. 187); and that he was the keeper of the keys for at least part of the morning. He later loaned them to his fellow inmate Bigelow, and subsequently sought their return for use in the unsuccessful attempt to flee via the skylight (Tr. 938-39, 940-46).
 
 
 26
 None of the appellants covered by this point Greenfield, Langley and Matthews took the stand in his own behalf, and there was no possibility that Bridgeman's proffered testimony would completely exonerate them. As a matter of fact, in another trial (that of Brown and Johnson), counsel for one of the co-appellants did call Bridgeman as a witness. We take judicial notice that Bridgeman's testimony on cross-examination in that case was allegedly prejudicial to the defense; in fact, the decision to place Bridgeman on the stand led to a claim of ineffective assistance of counsel, Coleman v. Burnett, 155 U.S.App.D.C. 302, 313, 477 F.2d 1187, 1198 (1973). See Craemer v. Washington, 168 U.S. 124, 129, 18 S.Ct. 1, 42 L.Ed. 407 (1898); Butler v. Eaton, 141 U.S. 240, 243-44, 11 S.Ct. 985, 35 L.Ed. 713 (1891); Zahn v. Transamerica Corporation, 162 F.2d 36, 48 n.20 (3rd Cir. 1947). Much the same testimony could have been produced if Bridgeman had testified for Matthews, Greenfield or Langley and had been subjected to cross-examination. We accordingly conclude that the trial court acted well within the discretion afforded it in refusing to sever Bridgeman from the trial. It also appears that Matthews, Langley and Johnson misjudged the probative effect of Bridgeman's testimony under applicable conspiracy law.
 
 
 27
 (2) Terry L. Burgin
 
 
 28
 Counsel for Burgin argued that all seven appellants were granted immunity from prosecution by a note signed by Kenneth Hardy, Director of the District of Columbia Department of Corrections, Deputy Director Rogers, and Superintendent Anderson Magruder. He contended that Hardy's agreement, after long hours of extreme physical abuse, not to take "reprisals of any kind," not to personally "bring any court action against any of the inmates," and to continue the inmates "in their present location pending any court action," either immunized appellants from prosecution or warranted remand for further consideration of the immunity issue by the trial court.[2] This argument was based on an analogy to the plea-bargaining principles of Santobello v. New York[3] and the theory that Hardy acted as agent of the United States Attorney in promising not to take retributive action.
 
 
 29
 We have considered the immunity claim in the companion case of United States v. Gorham, --- U.S.App.D.C. ---, 523 F.2d 1088 (decided Nov. 28, 1975). We recite in concise form the conclusions we reached in that appeal. First, the decision in Santobello on which appellants would rely involved fundamental principles of contract law, notably those concerning mutually binding promises freely given in exchange for valid consideration. These factors were not present in Hardy's "negotiations" with the rebellious inmates. The prisoners' tacit guarantee that no further violence would ensue promised only the performance of a pre-existing duty, a typical example of invalid consideration. The promise Hardy offered in exchange was secured through the most patent sort of duress and thus was voidable. Were his agreement to be construed as an absolute immunization of appellants from prosecution, it would be contrary to public policy and Nudum pactum. See 6A A. Corbin, Contracts § 1421 (1963).
 
 
 30
 Second, appellants' claim rests on a decidedly inferior interpretation of the terms of Hardy's agreement. His note read:
 
 
 31
 I, Kenneth Hardy, Director of the Department of Corrections of the District of Columbia, hereby promise that there will be no reprisals of any kind, including no deadlock, nor will I bring any court action against any of the inmates involved in the action that has taken place on October 11, 1972 at the D.C. Jail. The inmates will be continued in their present location pending any court action.
 
 
 32
 Subsequent statements by Hardy recited in our Gorham opinion confirm what the language of his note suggests: that his promise was not to engage in administrative reprisals and not to personally institute lawsuits against the rebellious inmates. These representations were fulfilled. In light of the note's final assertion that inmates would not be moved "pending any court action," the claim that Hardy attempted to prevent any future indictment or prosecution by the United States Attorney is utterly implausible.
 
 
 33
 Third, we reject appellants' suggestion that Hardy actually possessed the authority to grant insurgent prisoners immunity from prosecution for their offenses. As we pointed out in Gorham, power to grant immunity exists only through specific statutory authorization, United States v. Ford, 99 U.S. 594, 606, 25 L.Ed. 399 (1879); federal statutes generally limit such authorization to grants of immunity for potential witnesses, and thus no authority is claimed for Hardy's putative promise. Moreover, Hardy served as the agent of the Attorney General for the limited and express purpose of exercising custody over certain prisoners convicted or detained under congressional enactment, and thus even if the Attorney General or the United States Attorney possessed the power appellants ascribe to them, Hardy's action could not have bound them to forbear prosecution on an agency theory.
 
 
 34
 Finally, appellants suggest that an order issued by Judge Bryant in a related case[4] interpreted Hardy's note to preclude their prosecution and gave judicial force and dignity to the agreement. That order provided:
 
 
 35
 3. Defendants (supervisory personnel at the D.C. Jail), their agents and employees, shall take no action, nor make any threat of action, to injure or harass any inmate because of actions arising out of the disturbance at the District of Columbia Jail on October 11 and 12, 1972.
 
 
 36
 We note that the terms of this order relate, as did the language of Hardy's agreement, to future administrative reprisals within the correctional system, not to prosecution in federal court. Moreover, Judge Bryant had no more authority to grant appellants immunity than Kenneth Hardy; the power to grant immunity resides in the executive and the legislature, McCarthy v. Arndstein, 266 U.S. 34, 42, 45 S.Ct. 16, 69 L.Ed. 158 (1924), and absent statutory authority a federal judge is without power to grant immunity from prosecution for criminal offenses, Isaacs v. United States, 256 F.2d 654, 661 (8th Cir. 1958). Thus we reject appellant Burgin's claim that all the indictments in this case should be dismissed because of Hardy's note and Judge Bryant's order.
 
 
 37
 (3) Robert G. Matthews
 
 
 38
 (a) The conspiracy.
 
 
 39
 Matthews attacks his conspiracy conviction, alleging that the "evidence is consistent only with his spontaneous participation in certain activities," that "nothing suggests that there was any participation on his part that was planned in conjunction with others," that he simply "happened to be in the same place at the same time . . . (and was) caught up in the events of the moment." Brief for Matthews at 8, 10. His contention is that conspiracy charges should be reserved for those who engage in deliberate plotting and preparation, and should not be leveled against those who merely participate in events planned and executed through others' conspiratorial prearrangement.
 
 
 40
 Matthews' claim suggests that only the prearrangement to smuggle the gun into D.C. jail should give rise to conspiracy charges; in that case, only Bridgeman, Frank Gorham and Robert Jones would have been properly indicted on the conspiracy count. But the events and offenses that occurred between the release of inmates from their cells and the various attempts at escape through the skylight and the Rotunda similarly constituted planning and preparation to escape from the jail. Any prisoner who perceived that an escape would be attempted[5] and who decided to leave his cell and act in furtherance of that objective could properly be deemed as joining in the larger conspiracy to escape which was being carried out while rebellious inmates tortured and hid behind their hostages in an unlawful attempt to obtain their freedom. See generally United States v. Kaczmarek, 490 F.2d 1031, 1035 (7th Cir. 1974); Nassif v. United States, 370 F.2d 147, 151-52 (8th Cir. 1966).
 
 
 41
 Testimony at trial established that Matthews had held Kenneth Hardy by the collar while the final plan to rush the Rotunda door was formulated, stood in the front line of inmates at that door holding Hardy as a shield, taking turns with Burgin beating Hardy to compel him to order the door opened, and participated in the general harangue against Hardy that followed the abortive Rotunda attempt (Tr. 270, 273, 296, 631, 664, 770, 802-06, 820). We find this evidence sufficient to justify a verdict that Matthews participated in the conspiracy to escape from D.C. jail.
 
 
 42
 (b) The delay in the indictment.
 
 
 43
 The offenses with which appellants were charged occurred on October 11 and 12, 1972. Following an exhaustive five-month investigation by a special grand jury, appellants' indictment was returned on October 5, 1973. Brown, Matthews and Johnson argue that this delay of slightly less than a year violated their Fifth Amendment right to due process and their Sixth Amendment guarantee of a speedy trial, as defined by United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). They point to the absence of any justification for the hiatus, and suggest it may have made identifications, conducted nine to twelve months after the event, unreliable. And they insist that to make them specify the facts they have forgotten over the course of this delay puts them in an impossible "Catch 22" situation. Because of the inevitable "erosion of the accused's capability to muster his response to the charges," United States v. Parish, 152 U.S.App.D.C. 72, 76, 468 F.2d 1129, 1133 (1972), Cert. denied, 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1973), appellants insist the charges against them should be dismissed.
 
 
 44
 Marion in fact contemplates such a remedy for pre-arrest or pre-indictment as well as for pre-trial delay, but on the condition that the defendant can show at trial that the delay "caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324, 92 S.Ct. at 465. Neither of those requirements is satisfied here. The obvious reason for the delay was the magnitude and complexity of the crimes. More than 150 prisoners were in the cellblock at the time of the uprising, and the interviews and investigation which necessarily ensued were lengthy and laborious. The prosecution had to search out a well-concealed conspiracy, and to follow it beyond the participants involved in this case to determine whether there was any participation or assistance by correctional officials. During the investigatory period none of the appellants were arrested or charged with offenses arising out of the disturbance. We have seen no evidence that the year delay was the result of a deliberate prosecution tactic, nor have appellants made any serious allegation to that effect.
 
 
 45
 Appellants' claim of prejudice is equally insubstantial. Matthews can allege only a general dimming of memories and loss of evidence, varieties of prejudice the Marion court specifically rejected as "not in themselves enough to demonstrate that (appellants) cannot receive a fair trial . . . ." 404 U.S. at 325-26, 92 S.Ct. at 466. Memories inevitably dim with the passage of time, but the statute of limitations is the primary measuring stick to gauge whether a criminal charge is unduly stale. Marion v. United States,supra at 322, 92 S.Ct. 455; United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).
 
 
 46
 Brown claims that he might have received a concurrent sentence for offenses growing out of the uprising, with an effective date beginning on October 11, 1972. The contention is unrealistic for two reasons. First, courts do not customarily adjudge sentences concurrent with existing prison or jail sentences when prisoners are convicted of attempted escape from confinement: to do so would undermine the deterrence of future attempts. At the time of sentencing in this case, Judge Gasch announced that he was not considering concurrent sentences, but believed that additional time in this instance, one year should be added to Brown's prior sentence. Sentencing Transcript, William Brown, 23-24. Second, Brown was out on bond pending his trial in this case, and was even able to flee during the middle of his trial.[6] He was thus not serving any sentence during the preponderance of the delay which he protests, and could not have served two terms concurrently during that period.
 
 
 47
 (4) James A. Bridgeman
 
 
 48
 Bridgeman's counsel argues on his behalf and for his co-defendants in the first trial, Messrs. Greenfield, Matthews and Langley, that the evidence did not support their conviction on the thirty-ninth count of the indictment charging incitement to riot:
 
 
 49
 On or about October 11, 1972 within the District of Columbia the defendants herein . . . did feloniously, willfully and knowingly incite and urge others within cell block number one of the District of Columbia Jail to engage in a riot, and in the course of and as a result of the aforesaid riot, there was property damage in excess of $5,000, and serious bodily harm to Charles Wren, Bruce A. Davis and Santionta C. Butler; namely: Charles Wren was beaten about the body and head with a pistol and other weapons causing grave bodily harm to Charles Wren; Bruce A. Davis and Santionta C. Butler were repeatedly forced to engage in both anal and oral sodomy, causing grave bodily harm to said Bruce A. Davis and Santionta Butler. In violation of D.C. Code § 22-1122(d).
 
 
 50
 The applicable statute in the District of Columbia provides:
 
 
 51
 S 22-1122. Rioting or inciting to riot Penalties
 
 
 52
 (a) A riot in the District of Columbia is a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons.
 
 
 53
 (b) Whoever willfully engages in a riot in the District of Columbia shall be punished by imprisonment for not more than one year or a fine of not more than $1,000, or both.
 
 
 54
 (c) Whoever willfully incites or urges other persons to engage in a riot shall be punished by imprisonment for not more than one year or a fine of not more than $1,000 or both.
 
 
 55
 (d) If in the course and as a result of a riot a person suffers serious bodily harm or there is property damage in excess of $5,000, every person who willfully incited or urged others to engage in the riot shall be punished by imprisonment for not more than ten years or a fine of not more than $10,000, or both.
 
 
 56
 Appellants contend that the events of October 11 and 12 did not constitute a riot within the meaning of the statute because there was no "public disturbance." They assert that since evidence was required of "a public disturbance such as to bring about public terror (that) . . . this particular incident Inside the District of Columbia jail (could not and) did not bring about Public terror . .." Their premise is that "as a matter of law a disturbance within the confines of a jail cannot be termed a 'public disturbance' (because) . . . a jail is severely restrictive both in terms of access and use and by definition it cannot be considered a public place and any disturbance which occurs there is not a "public disturbance." Bridgeman's brief at 32-33. Appellants supplement this claim with an argument that the D.C. riot statute was enacted in 1967 for the express and limited purpose of controlling street disturbances, not to supplant the offense of common law riot. Thus they reason that congressional intent does not support application of the provision to the disorder at the jail.
 
 
 57
 The offense of common law riot required only three participants, 2 F. Wharton, Criminal Law and Criminal Procedure § 860 (R. Anderson ed. 1957), while the D.C. statute applies to disturbances involving five or more persons. With the exception of this discrepancy, we find that the D.C. provision was intended to subsume all aspects of the common law crime. The language and legislative history of section 22-1122 reflect an interest in preventing not only spontaneous street demonstrations but also in proscribing riot and even incitement to riot, an offense whose coverage under the common law was uncertain.[7] In short, section 22-1122 was designed to be an all-encompassing statute for the District of Columbia, obviating resort to peripheral laws, including common law offenses, which could apply to separate features of a riot.
 
 
 58
 Assistant Attorney General Fred M. Vinson, Jr. of the Criminal Division, testifying on behalf of the proposed bill drafted by the Justice Department, highlighted the breadth of its provisions:
 
 
 59
 Quick and effective prosecution is not assured when the United States Attorney must proceed indirectly through related statutes and justice is not done when penalties are not commensurate with the seriousness of the offense. . . .
 
 
 60
 In the view of the Department of Justice these provisions constitute a model local law for dealing with riot and incitement to riot. It incorporates the basic thrust of the common law statutes found in many jurisdictions and at the same time modernizes the law and takes cognizance of the First Amendment.[8]
 
 
 61
 The Senate Report on the bill discloses a similar intent to design a solitary, comprehensive statutory provision for riot and incitement to riot:
 
 
 62
 While there are existing laws which could apply in a riot situation it is most desirable to provide the District of Columbia with clear statutory language prohibiting acts of riot and incitement to riot.[9]
 
 
 63
 The legislative history reveals an attempt to do away with misdemeanor punishment for aggravated riot and incitement to riot and to accord all riot offenses the status of felony. In his testimony Vinson endorsed passage of the bill to allay the fear that other statutory provisions, such as those proscribing disorderly conduct and unlawful assembly, "might preempt the common law (offense of riot)."[10] The broad language of section 22-1122 and these indicia of congressional understanding of the provision dispel any doubt that it is sufficiently comprehensive to cover the sort of disturbance that occurred at D.C. jail on October 11 and 12, 1972. We hold that where five or more persons are involved section 22-1122 supplants the entirety of the common law offense of riot, that it includes street disorders within its ambit but is by no means limited to them.
 
 
 64
 We also find that the evidence used to convict appellants on the riot count satisfies the "public disturbance" requirement of the statute. All parties admit that a riot is a breach of the peace which causes public terror, committed by an unlawful assembly of a stated number of persons, here a minimum of five. The assembly we consider in this case was clearly unlawful, and caused the personal injury and property damage required by the statute;[11] thus the question remains whether it caused public terror. Appellants contend that it did not because it was confined to the cell block; they suggest Congress intended to limit prosecutions to those riots which are joined by or accessible to all members of the general public. This interpretation is based on the fourth preferred dictionary definition of the word "public." Webster's Third New International Dictionary 1836 (1963). The first preferred meaning, thus the most common usage of the word, encompasses events "relating to or affecting the people of an organized community." Congress must be deemed to have intended the most common, generally accepted meaning of the words it used, See, e. g., United States v. Sacco, 491 F.2d 995, 1001 (9th Cir. 1974) (En banc); Rogers v. Cheng Fu Sheng, 108 U.S.App.D.C. 115, 116, 280 F.2d 663, 664, Cert. denied, 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960). Thus we conclude that section 22-1122 proscribes any disorder which constitutes a breach of the peace[12] and Affects the public.
 
 
 65
 We note that this construction of the "public disturbance" requirement is consonant with the approach reflected in numerous decisions interpreting state riot statutes.[13] In State v. Winkels, 204 Minn. 466, 283 N.W. 763, 764 (1939), the Minnesota Supreme Court considered a statute which provided that a riot occurred "whenever three or more persons, having assembled for any purpose, shall Disturb the public peace by using force or violence to any other person or property . . . ." (Emphasis added.) Chief Justice Gallagher's opinion showed that the public peace could be disturbed by the repercussions of a riot in areas where the disturbance could not be seen or heard:
 
 
 66
 The public peace means that tranquility enjoyed by a community when good order reigns amongst its members. Town of Neola v. Reichart, 131 Iowa 492, 494, 109 N.W. 5; City of Corvallis v. Carlile, 10 Or. 139, 142, 45 Am.Rep. 134; State v. Benedict, 11 Vt. 236, 239, 34 Am.Dec. 688.
 
 
 67
 The Ninth Circuit's decision in Salem Manufacturing Co. v. First American Fire Insurance Co., 111 F.2d 797, 803 (9th Cir. 1940), reaches the same conclusion.
 
 
 68
 "To constitute a riot it is not necessary that there should be actual fright to the public generally. It is enough if the action of the parties implicated be so violent and tumultuous as to be likely to cause fright, and if individuals are frightened." These general definitions are approved in Aron v. Wausau, 98 Wis. 592, 74 N.W. 354, 40 L.R.A. 733; State v. Stalcup, 23 N.C. 30 (1 Ired.Law 30), 35 Am.Dec. 732; Lycoming F. Ins. Co. v. Schwenk, 95 Pa. 89, 40 Am.Rep. 629; Dupin v. Mutual Ins. Co., 5 La.Ann. 482; Com. v. Gibney, 2 Allen (Mass.) 150; State v. Snow, 18 Me. 346; State v. Hughes, 72 N.C. (25), 27.
 
 
 69
 These decisions reflect the prevailing view that the location of a disturbance is immaterial to the determination whether it fits the statutory definition of riot. A riot may take place in a penitentiary, McClelland v. State, 4 Md.App. 18, 240 A.2d 769, 776-777 (1968); Commonwealth v. Zwierzelewski, 177 Pa.Super. 141, 110 A.2d 757, 760 (1955); and soldiers in a military camp may violate an anti-riot statute, Pitchers v. Surrey County, 39 T.L.R. 7 (1924). The court in Zwierzelewski rejected the argument advanced here that a riot can occur only in a place of public access, and volunteered that a "riot may take place in a church, Com. v. Dupuy, 4 Clark 1, or in a dwelling house, Pennsylvania v. Bugher, Add(ison), 333." 110 A.2d at 760. Moreover, "(t)he ingredient of terror excited does not require that more than one person be alarmed." To this end Wharton states:
 
 
 70
 If the nature of the defendants' conduct is calculated to induce fear or terror, the offense is riot even though only a few or merely one person was in fact terrified.
 
 
 71
 2 F. Wharton, Criminal Law and Criminal Procedure § 865 at 732 (R. Anderson ed. 1957). See also State v. Acra, 2 Ind.App. 384, 28 N.E. 570 (1891); People v. O'Laughlin, 3 Utah 133, 1 P. 653, 659 (1882), Citing Bishops, Criminal Law § 1148; State v. Powell, 70 N.C. 67 (1874); Darst v. People, 51 Ill. 286, 2 Am.Rep. 301 (1869); State v. Boies, 34 Me. 235 (1852); 77 C.J.S. Riot at 427 (1952). Thus the terror inflicted on Kenneth Hardy alone was adequate to satisfy the public disturbance requirement of the statute.
 
 
 72
 Application of the test we adopt for the public disturbance requirement not whether a riot occurs in a public place, but whether it Affects the public yields the unequivocal conclusion that the October 11 uprising at D.C. jail in fact caused "public terror." We need not consider whether those prisoners in the cell block who declined to participate and who were obviously terrorized by the violent acts and threats they witnessed were members of the public within the meaning of the public disturbance requirement, for the testimony is clear that members of the public outside the cell block were also terrorized. Testimony at trial indicated that there was media coverage of the "revolution" (Tr. 471-472, 825-826); that several hundred members of the public congregated outside the jail (Tr. 1006); and that the police had to surround the jail and block the streets around it (Tr. 1005). The Rotunda area was a public place, and members of the general public who entered it were surely terrorized when confronted with rioting prisoners beating on the door between the Rotunda and the cell block, using correctional officers as shields and torturing their hostages to aid their escape attempt. As noted, the threats and beatings Kenneth Hardy endured following his entry into the cell block constituted public terror within the meaning of the riot statute, dramatized by his brief hospitalization following the incident.[14]
 
 
 73
 In conclusion, we find that the uprising of October 11 and 12 did create public terror and was a "public disturbance" within the meaning of the statute. We thus reject appellants' attack on their conviction for incitement to riot, which as charged in the indictment required proof of the actual existence of a riot.
 
 
 74
 (5) James R. Langley
 
 
 75
 Counsel for Langley centered his argument on the contention that the convictions of appellants Bridgeman, Johnson, Brown, Greenfield, and Langley should be reversed for an alleged denial of fair trial due to the admission of evidence of "about thirty" homosexual assaults on Bruce Davis by various unnamed inmates of the jail during the riot. As a result of this experience it was necessary to place Davis under psychiatric care. The evidence was admitted to prove the specific allegation of the indictment that the riot caused the kind of serious bodily harm required for conviction under the riot statute. As noted, D.C. Code § 22-1122 contains the following provision:
 
 
 76
 If in the course and as a result of a riot a person suffers Serious bodily harm or there is property damage in excess of $5,000, every person who willfully incited or urged others to engage in the riot shall be punished by imprisonment for not more than ten years or a fine of not more than $10,000, or both.
 
 
 77
 D.C. Code § 1122(d) (emphasis added). In charging appellants with inciting to riot, count 39 of the indictment alleged:. . and in the course of and as a result of the aforesaid riot, there was property damage in excess of $5,000, and serious bodily harm to Charles Wren, Bruce A. Davis and Santionta C. Butler; namely: Charles Wren was beaten about the head and body with a pistol and other weapons causing grave bodily harm to said Charles Wren; Bruce A. Davis and Santionta C. Butler were repeatedly forced to engage in both anal and oral sodomy, causing grave bodily harm to said Bruce A. Davis and Santionta Butler.
 
 
 78
 To support this allegation that "serious bodily harm" to Davis resulted from the riot, the Government introduced evidence through Davis, a homosexual inmate confined to Cell Block One during the disturbance, that he was sexually assaulted by approximately 30 persons during the riot and as a result he was undergoing psychiatric care (Tr. 862-867, Tr. 792-797).
 
 
 79
 It is alleged that this evidence was inadmissible because its "prejudicial value . . . far outweighed any probative value." To state the relevant principle of evidence in such shorthand fashion ignores some of its vital aspects. The rule fairly stated by Wigmore is:
 
 
 80
 (I)f certain evidential material, having a legitimate probative value, tends nevertheless to produce also, over and above its legitimate effect, an unfair prejudice to the opponent . . . there is good ground for excluding such evidence, Unless it is indispensable for its legitimate purpose.
 
 
 81
 6 J. Wigmore, Evidence § 1865 (1940) (emphasis added). See also Scales v. United States, 367 U.S. 203, 255-56, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Chandler v. United States, 378 F.2d 906, 908 (9th Cir. 1967). The statement of the same general rule with respect to circumstantial evidence similarly excludes such evidence only when it creates undue prejudice "In excess of its legitimate probative weight." 6 J. Wigmore, Evidence § 1904 (1940) (emphasis added). The inquiry thus turns to the legitimacy of the purpose for which evidence of homosexual rapes was admitted.
 
 
 82
 The riot count of the indictment, Supra, charges that the riot caused (1) "property damage" and (2) "serious bodily harm." Evidence of the homosexual rapes was indispensable in proving the "serious bodily harm" to Davis specifically alleged in the indictment. Davis was subpoenaed to offer direct evidence in support of that allegation, and no more extensive or detailed testimony was sought than was necessary to persuade the jury that the allegation was accurate. The Government acted with restraint in introducing this evidence and did not indulge in needless repetition or resort to flamboyant or inflammatory proof. There was no suggestion that appellants were to be held responsible for substantive offenses growing out of the homosexual attacks, and thus it cannot be asserted that potentially prejudicial evidence was introduced save where it was "indispensable for its legitimate purpose."
 
 
 83
 Appellants further contend that since the Government proved that the riot caused property damage in excess of $5,000, and since the statute requires property damage Or serious bodily harm in the alternative, that all evidence of serious bodily harm by the rapes was unnecessary and should have been completely excluded because of its inflammatory character. We find they take too restrictive a view of permissible conduct in prosecuting a criminal indictment. Where a criminal statute proscribes conduct in the alternative, the Government is entitled to prove Both features of the crime. To find prejudice and reversible error in this case would imply the existence of a rule of limitation on prosecutors, that once they have established a prima facie case of a statutory violation based on one set of statutory requirements, they may not introduce any evidence of another specific element of the offense. However, the Government bears the heavy burden of proving its allegations beyond a reasonable doubt and is not required to limit itself to minimal proof. Judge Gasch responded this way to the suggestion:
 
 
 84
 what you are arguing is once the government has made a prima facie case, then the court should cut off the flow of evidence. That isn't the rule.[15]
 
 
 85
 Cases which appellants cite suggesting the extreme caution with which trial courts should receive evidence involving homosexuality do not involve the situation encountered here, where evidence of homosexual conduct goes to prove a specific and essential element of the offense charged.
 
 
 86
 We conclude that the prosecution was not to be limited to proving property damage where it could also establish personal injury. Where both Hardy and Wren minimized the extent of their wounds during their testimony, the Government was not required to assume the risk that the jury might not consider their injuries "serious," when in fact independent evidence of other serious bodily harm existed. Because the testimony was presented without sensationalism, and because it went to a specific and primary statutory element, its introduction served a legitimate purpose and cannot be deemed prejudicial. And Judge Gasch's instruction in each trial that the testimony went to proof of the "serious bodily harm" precludes the claim that appellants were confronted with evidence of the separate offense of sodomy.
 
 
 87
 (6) Henry B. Johnson
 
 
 88
 (a) Assistance of Counsel.
 
 
 89
 Appellate counsel for Johnson argued that his client received ineffective assistance from his trial counsel because the latter allegedly failed to assert control over the flow of witnesses. Johnson informed his trial counsel that he wanted to call nine people to testify in his behalf. The initial judgment of trial counsel was against calling all these witnesses; he recalled advising Johnson that "the more witnesses he puts on . . . the more the Government . . . opportunity to bring out inconsistencies." Trial counsel "had contemplated calling one, Mr. Wiggins, possibly another, but Mr. Johnson wanted all his witnesses called."[16] Trial counsel put the situation on the record in a bench conference and the court ruled:
 
 
 90
 Now, my ruling is you (counsel) are in charge of the case, but I want you to listen to the consideration that he seeks to advance and call these people. If you come up with a conclusion that these people can't help him in his defense, then your decision will control.[17]
 
 
 91
 Counsel proceeded to call Wiggins, Bridgeman and Heinlein. After Heinlein testified, counsel decided not to call Beard, even though Johnson kept insisting that more witnesses be called.[18] Counsel subsequently refused to call any additional witnesses. Johnson now argues that the testimony offered by Bridgeman and Heinlein was prejudicial and that his attorney was ineffective for failing to meet his responsibility under applicable ABA standards to determine trial tactics himself.
 
 
 92
 Johnson attacks the attorney for ignorance of the rules governing such disputes over the decision to call witnesses, but the attorney admitted his indecision and sought and obtained the guidance of the trial judge on the issue. His conduct was conscientious and diligent, which is all that the ABA standards and our decision in United States v. DeCoster[19] require. We reject appellant's attempt to reverse his position at trial and now to protest trial counsel's decision to accede to his insistent demands that all nine witnesses be called: he cannot play both sides of the street. He repeatedly tried, with limited success, to overrule his attorney's determinations concerning the calling of witnesses. The fact that deliberation on this issue was lengthy and intense and was conducted under the court's supervision undermines Johnson's attack on trial counsel's judgment; that the attorney's position largely prevailed suggests he did not abdicate his fundamental responsibility to manage the defense. Moreover, in light of the substantial and persuasive evidence against Johnson, any claim of prejudice from the testimony presented at Johnson's insistence is highly speculative.
 
 
 93
 (b) Sufficiency of evidence.
 
 
 94
 Johnson was found guilty by the jury of conspiracy, attempted escape, armed kidnapping, robbery, and riot. Sentences were imposed on each count to run concurrently with each other and with any sentence currently being served. At oral argument Johnson's counsel contended that "the evidence was insufficient on all counts" and that the court erred in refusing to grant the timely motions for judgment of acquittal. The claim is not that there was a complete absence of evidence but that the evidence, particularly on the conspiracy count, was "very weak." For this reason, the argument goes, the conviction on the conspiracy count should be reversed, and because the alleged impact of the conspiracy count on the trial may have influenced the jury to return guilty verdicts on the substantive counts, Johnson's conviction on those counts may not rest on the principle of Pinkerton v. United States.[20] The alleged inadequacy of the evidence to support the conspiracy charge is thus the keystone to this portion of appellants' argument. However, we find the evidence to be sufficient for the jury to have concluded that Johnson with knowledge of the existence of the conspiracy purposefully associated himself with it and by his acts contributed his efforts to an attempt to further its objectives.
 
 
 95
 In evaluating this point we must take that view of the evidence most favorable to the jury's verdict. From that perspective, we note that when a number of the guards were locked in cell 128 and held as hostages they saw Johnson several times and "he was talking about this was a revolution" (Tr. 486-87); he was "yelling revolution" (Tr. 550-51); he frequently checked the cells where the guards were confined as hostages and thus appeared to be one of several inmates performing that function (Tr. 694-95); and he talked to the guards about revolutionary tactics and stated that because he "had a whole lot of time (to serve) . . . he had nothing to lose by going out looking" (Tr. 695-96). Johnson was also identified as a member of the group that had separated from those who did not want to escape (Tr. 491, 728) immediately before the rebellious inmates clustered for the breakout attempt at the Rotunda door (Tr. 494-95, 497, 498, 518-19, 728).
 
 
 96
 Following the failure of that escape attempt those hostages who had been used as shields were returned to the cells where they had been held, and Johnson "came by the cell many, many times" armed with a short piece of steel with a sharp end" (Tr. 502).
 
 
 97
 At this time Mr. Johnson was walking up and down the tier, and he made a statement to the effect that if things didn't go right in court, We weren't coming out of there, and that was just the way it went. Forget about coming out of there if things didn't go right in court.
 
 
 98
 (Tr. 502) (emphasis added). The mention of things going "right in court" was a reference to the inmate "negotiators" who, using their hostages for leverage, had been allowed to go to the United States District Court in an effort to secure immunity from reprisals for those engaged in the conspiracy, riot and other offenses. Johnson also threatened the hostages, "If the negotiations did not go well downtown, that We could expect the worst " (Tr. 431, 455) (emphasis added).
 
 
 99
 Johnson contradicted the foregoing testimony with the explanation that he had spent the day in a fourth-tier cell drinking coffee, eating cookies, and talking about life in general (Tr. 1058-68). Thus there was ample evidence which, if credited, would have supported guilty verdicts against Johnson on the counts he now disputes. The credibility and weight to be accorded that evidence was for the jury to determine, and it carried out its function by finding him guilty on those counts. We find no basis for interfering with the resulting judgment.
 
 
 100
 (7) William Brown, a/k/a "Bill-Bill" Brown
 
 
 101
 In support of Brown's appeal his counsel argued (1) that it was error to refuse to sever his trial from Johnson's because some testimony of Johnson's witnesses would be prejudicial to his case, and (2) that D.C. Code § 22-3202, under which appellant was sentenced to a mandatory minimum sentence because of a previous conviction for a "crime of violence," is unconstitutional.
 
 
 102
 (a) The testimony of Johnson's witnesses.
 
 
 103
 Brown claims that he was prejudiced by witnesses called by his co-defendant in the second trial, Johnson, and that denial of his Motion for Severance was therefore erroneous. The claim echoes Johnson's contention that the latter's attorney was ineffective for having allowed Bridgeman and Heinlein to testify against his better judgment. But none of the three witnesses summoned by Johnson ever mentioned Brown on the stand, despite the Government's attempt on cross-examination to get them to "name names" (Tr. 946, 965, 970). In fact Bridgeman specifically refused to name Brown as one of the leaders of the uprising (Tr. 970). Judge Gasch commented that Bridgeman's testimony had not "hurt" Brown (Tr. 1140), who had fled in the middle of the trial, and Brown's counsel indicated his client was trying to "get mileage in an energy crisis" (Tr. 1141). Finally, as the Government contends, the evidence showing Brown's pivotal and violent role in the rebellion was so strong[21] that any error in denial of his attorney's motion for a mistrial was clearly harmless.
 
 
 104
 (b) The validity of the sentence under D.C. Code § 22-3202.
 
 
 105
 Judge Gasch sentenced Brown to the mandatory minimum term on 12 counts of armed kidnapping. Brown now challenges that sentence, arguing that the statute only applies to offenses prosecuted in the Superior Court of the District of Columbia. The statute by its language requires an additional punishment of five years' imprisonment whenever a person "is convicted more than once of having committed a crime of violence in the District of Columbia."[22] Appellant Brown was convicted, among other offenses, on twelve counts of armed kidnapping in violation of 22 D.C.Code §§ 2101, 3202. He had previously been convicted in the District of Columbia on a charge of armed robbery. Criminal Case No. 404-72.
 
 
 106
 Following oral argument on this issue the trial court ruled that the mandatory provisions of 22 D.C. Code § 3202(a)(2) were applicable to Brown and that he was required to adjudge the maximum sentence (Brown Sent. Tr. 23). The armed kidnapping charges against Brown were properly tried by the federal court in the District of Columbia under 11 D.C. Code § 502(3), which specifically confers upon the United States District Court for the District of Columbia jurisdiction over "(a)ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense." Appellant was charged with conspiracy and attempted escape from federal custody in violation of 18 U.S.C. §§ 371 and 751(a) respectively, and the District of Columbia Code offenses were thus properly joined and tried in the U.S. District Court. We held in United States v. Thomas, 158 U.S.App.D.C. 233, 485 F.2d 1012 (1973), that D.C. Code § 22-3202 was applicable to offenses tried in U.S. District Court, and that decision disposes of Brown's contention that only convictions in D.C. Superior Court should invoke the minimum sentencing provisions of § 3202(a)(2).
 
 
 107
 Brown's counsel also contends that his client was not subject to be sentenced as a person "convicted more than once of having . . . committed a crime of violence in the District of Columbia" because the prior sentence was not adjudged by the court until October 17, 1972, some five days after the armed kidnappings charged in the instant indictment had occurred on October 11 and 12, 1972. The statute, however, does not require that the second crime occur after sentence is adjudged on the prior "crime of violence." It speaks in terms of a prior conviction existing at the time of a subsequent sentencing: a defendant who has been convicted of one violent crime at the time he is sentenced for a second crime of violence clearly comes within the purview of the statute, even though his sentence on the first conviction was not adjudged until after the second crime was committed. Because Brown's armed robbery conviction preceded his sentencing in this case, the mandatory minimum sentence was required.
 
 
 108
 Finally, Brown argues that the minimum sentence provision is unconstitutional because it divests the trial court of all discretion concerning the duration of punishment or the granting of probation. In 1916 the Supreme Court held that a United States District Court was not free to ignore a congressionally imposed minimum sentence. Ex parte United States, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916). The Court reiterated that the statutory boundaries of criminal sentences are "peculiarly questions of legislative policy" in Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958). These decisions effectively foreclose appellant's constitutional attack on the mandatory minimum sentence.
 
 
 109
 (8) Miscellaneous
 
 
 110
 We have disposed of all major points raised by counsel at oral argument. Additional arguments presented in the briefs were not advanced in court even though the time for oral argument was greatly extended over that normally allowed. We have examined, considered and rejected as insubstantial these additional points, to wit: that it was error to sequester the jury in the trial of Brown and Johnson; that the Government should have been required to elect between the conspiracy count and the substantive counts in that trial; that Johnson on his motion should have been granted a mistrial when his co-defendant Brown absconded in the middle of the trial; that the Government prejudicially exceeded the bounds of proper cross-examination of appellant Bridgeman in Johnson's trial; that Bridgeman was improperly convicted of both conspiracy and the substantive counts; that the evidence was insufficient to support the conviction of Matthews in certain respects; and that it was error to exclude from Burgin's trial testimony as to conditions in the jail.
 
 
 111
 Because appellants have failed to identify any reversible error, we affirm the judgments of convictions entered against all appellants on all counts.
 
 
 112
 Judgment accordingly.
 
 
 
 [1]
 Robert N. Jones is the commonly used alias of Otis D. Wilkerson, whose appeal, together with that of Frank Gorham, was considered in our decision in United States v. Gorham, --- U.S.App.D.C. ---, 523 F.2d 1088 (Nos. 74-1611 & 74-1613, Decided Nov. 28, 1975). Our opinion in that case treated the issue of immunity from prosecution raised here as well as claims germane only to those appellants
 
 
 [2]
 Gov't Br. at 38
 
 
 [3]
 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). See also Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)
 
 
 [4]
 Campbell v. Magruder (D.D.C., Civil Action No. 1462-71)
 
 
 [5]
 It must have been plain to any inmate who joined in the attempted escape and kidnapping of the correctional officers that some prior planning had been required to produce a loaded firearm. Those who had not partaken of the prearrangement would also have realized, as the escape plan unfolded before them and the original conspirators gave orders to further it, that the object of the conspiracy was the kidnapping of correctional officers and the use of those hostages as shields during a breakout
 
 
 [6]
 His flight gave rise to a claim in this appeal, which we reject, that Judge Gasch erred in denying appellant Johnson's request for a mistrial because of alleged prejudice caused by Brown's unexplained departure at mid-trial. Cf. United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963)
 
 
 [7]
 See Hearings on H.R. 12328, H.R. 12605, H.R. 12721 and H.R. 12557 Before a Subcomm. of the House Comm. on the District of Columbia, 90th Cong., 1st Sess. 20-22 (1967) (Statement of Hon. Fred M. Vinson, Jr., Assistant Attorney General, Criminal Division, Department of Justice)
 
 
 [8]
 Id. at 15-16
 
 
 [9]
 S.Rep. No. 912, 90th Cong., 1st Sess. 25 (1967)
 
 
 [10]
 Hearings on H.R. 12328, supra note 7, at 20
 
 
 [11]
 As noted, personal injury attributable to the uprising included numerous homosexual assaults, Kenneth Hardy's prolonged beatings, and violence to Lieutenant Wren causing a lacerated hand and broken finger. The estimated $76,000 in property damage caused primarily by arson clearly satisfies the statute's $5,000 requirement
 
 
 [12]
 It is a breach of the peace when acts or threats of violence cause consternation and alarm and thus disturb the tranquility of citizens or of a community, threatening the security and invading the protection which the law affords to every citizen. People v. Chesnick, 302 N.Y. 58, 96 N.E.2d 87, 88 (1950); Smith v. Drew, 175 Wash. 11, 26 P.2d 1040 (1933). In Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940), the Supreme Court stated that the "offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility."
 
 
 [13]
 In 1967 those states included Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Maine, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New York, South Dakota, Utah, and Washington. See Hearings on H.R. 12328, supra note 7, at 35-64
 
 
 [14]
 Another fact, which we do not rely upon in affirming the convictions on this count because it is only obliquely reflected in the record and was not before the jury, is that the activities of the rioters extended far beyond the cell block. Public fear for the safety of appellants' numerous hostages in the cell block was used as leverage to enable some of the leaders to leave the jail and go to the United States Court House, appear before a United States District Judge, and urge him to enter a court order, which they now assert granted them complete immunity for all their offenses. By that appearance in public they extended the terror of the disturbance to a public official and to a public courtroom. Another fact indicating public terror is that other public officials, including a member of Congress and the D.C. Delegate to Congress, considered the situation to be of sufficient gravity to require their intervention in the affair in order to save the hostages' lives
 
 
 [15]
 Gov't Br. at 57 n.64
 
 
 [16]
 Tr. 911
 
 
 [17]
 Tr. 1012-20
 
 
 [18]
 Tr. 1033
 
 
 [19]
 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973)
 
 
 [20]
 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In that case the Supreme Court held that a party to a continuing conspiracy could be convicted of substantive offenses committed in furtherance of the conspiracy, although he did not participate in or have knowledge of those offenses
 
 
 [21]
 Brown directed that Lieutenant Wren and other hostages be held in cells during the uprising (Tr. 571-72); acted as spokesman for the rebellious inmates in their communications with officials outside Cell Block One (Tr. 619); supervised the escape attempt at the Rotunda door (Tr. 687); managed negotiations after the attempt failed (Tr. 124, 590-600, 821-22); beat Lieutenant Wren in an attempt to make the Lieutenant's plea that the door be opened more convincing (Tr. 576, 578); held a gun to Kenneth Hardy's head (Tr. 151-52); and forced Lieutenant Wren's hand through a broken window, cutting it and breaking a finger (Tr. 588)
 
 
 [22]
 D.C. Code § 22-3202(a)(2) provides:
 (Any person) shall, if he is convicted more than once of having so committed a crime of violence in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a minimum period of imprisonment of not less than five years and a maximum period of imprisonment which may not be less than three times the minimum sentence imposed and which may be up to life imprisonment.